Karen deLAURIER, Plaintiff-Appellant,

v.

The SAN DIEGO UNIFIED SCHOOL
DISTRICT and Lester G. Warren-
brock, Defendants-Appellees.

No. 75–2096.

United States Court of Appeals,
Ninth Circuit.

Nov. 2, 1978.

Rehearing Denied Dec. 29, 1978.

Rehearing Denied Feb. 6, 1979.

Dale R. Larabee (argued), San Diego, Cal., for plaintiff-appellant.

Ralph D. Stern, School Atty. (argued), San Diego, Cal., for defendants-appellees.

Before HUFSTEDLER and WALLACE, Circuit Judges, and SMITH,* District Judge.

WALLACE, Circuit Judge:

deLaurier, a school teacher, appeals the decision of the district court that her rights under the Fifth and Fourteenth Amendments and Title VII of the Civil Rights Act of 1964 were not violated when her employer, the San Diego Unified School District, required her to go on leave at the beginning of her ninth month of pregnancy, refused to allow her to use accumulated sick leave benefits during that leave of absence, and declined to guarantee that she would be restored to her former teaching position. Some of the issues in this case have become moot; as to the remainder, we affirm in part, vacate and remand in part and reverse and remand in part.

## I.  Facts and Proceedings Before the District Court

deLaurier has been a full-time teacher at Hale Junior High School in the San Diego Unified School District (the district) since 1971. In August 1973 she became pregnant; in October she notified her principal of this fact. The district's policy made all pregnant employees eligible for maternity leave and required that such leave be taken no later than the beginning of the ninth month of pregnancy. Those returning to work from maternity leave were required to obtain a physician's statement that the health and welfare of neither mother nor child would be endangered thereby. District policy also provided that accumulated sick leave benefits could not be used during maternity leave.[1]

deLaurier asked that she be allowed to teach until the onset of labor, and that she be permitted to use her sick leave benefits thereafter until she returned to work. The district's Director of Personnel Administration informed her, however, that the normal policy would be enforced. Consequently, deLaurier left work on April 19, one month before the earliest date on which her doctor estimated she would deliver. Twelve days later, on May 1, deLaurier's baby was born.

Meanwhile, on April 17, deLaurier had commenced this action in the district court seeking declaratory and injunctive relief, damages, and a temporary restraining order. The restraining order was denied on April 19. After further preliminary proceedings, deLaurier filed her third amended complaint on June 6. In it she alleged that the district's mandatory maternity leave policy, its refusal to provide sick leave benefits during such leave, and the absence of a guarantee that she would be reassigned to her former position violated Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq.,[2] and the Fifth and

---

* Honorable Russell E. Smith, Chief Judge, United States District Court, District of Montana, sitting by designation.

1. Prior to the decision of the United States Supreme Court in *Cleveland Board of Education v. LaFleur*, 414 U.S. 632, 94 S.Ct. 791, 39 L.Ed.2d 52 (1974) the policy also provided that a teacher could not begin a new semester after the seventh month of pregnancy and that a teacher could not return to work until her baby was one month old. In January 1974, on the advice of counsel, the Superintendent of Schools deleted these provisions from the policy as inconsistent with *LaFleur*.

2. The relevant parts of Title VII provide:
   (a) It shall be an unlawful employment practice for an employer—
   (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex . . .; or

Fourteenth Amendments to the Constitution.[3] She also asked for her attorney's fees.

The district judge granted summary judgment for the district on the sick leave benefits and guaranteed reassignment issues. He found that the latter had become moot since deLaurier was in fact promised that she would have her former position when school began again in September. The sick leave benefits question was decided on the basis of the affidavits of the parties and *Geduldig v. Aiello,* 417 U.S. 484, 94 S.Ct. 2485, 41 L.Ed.2d 256 (1974).

The mandatory leave issue went to trial without a jury. After hearing witnesses and taking evidence from both parties, the court ruled for the defendants, finding that the district's policy was justified as a business necessity and a bona fide occupational qualification (BFOQ) reasonably necessary to the operation of the district.

While this case was pending on appeal, the State of California adopted legislation eliminating the policies of which deLaurier complains. Cal.Educ.Code §§ 13456, 13468 (West Supp.1977), as amended by Stats. 1975, ch. 914, §§ 1, 2. In addition, she was, as promised, restored to her former teaching position. Her prayers for declaratory and injunctive relief are thus moot. A live controversy remains, however, with respect to damages for the district's actions and, should deLaurier ultimately prevail, her request for attorney's fees.

We have twice delayed decision in this case, awaiting first the Supreme Court's disposition of *General Electric Co. v. Gilbert,* 429 U.S. 125, 97 S.Ct. 401, 50 L.Ed.2d 343 (1976), and thereafter its decisions in *Nashville Gas Co. v. Satty,* 434 U.S. 136, 98 S.Ct. 347, 54 L.Ed.2d 356 (1977); *Dothard v. Rawlinson,* 433 U.S. 321, 97 S.Ct. 2720, 53 L.Ed.2d 786 (1977); and *Richmond Unified School District v. Berg,* 434 U.S. 158, 98 S.Ct. 623, 54 L.Ed.2d 375 (1977). None of these decisions is dispositive of the questions in this case, but as will be seen, they assist in our analysis of the issues before us.

## II. *The Mandatory Maternity Leave Policy*

Over her objection, deLaurier was required to take maternity leave at the beginning of her ninth month of pregnancy. She challenges this policy under both Title VII and the Fourteenth Amendment. We first discuss the statutory question.

### A. *Title VII*

Under Title VII, a plaintiff has the initial burden of proving a prima facie case of discrimination, after which the burden shifts to the employer to justify the discrimination. Finally, the employer's otherwise valid defenses fail if the employee can show that the employer was discriminatorily motivated or that less discriminatory means were available to serve the employer's legitimate interests. *Dothard v. Rawlinson, supra,* 433 U.S. at 329, 97 S.Ct. at 2726; *Albemarle Paper Co. v. Moody,* 422 U.S. 405, 425, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975); *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802–04, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

We believe, as the district court apparently did,[4] that deLaurier has made out a prima facie case under Title VII.[5] This

---

(2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's . . . sex . . . .

42 U.S.C. § 2000e–2(a).

deLaurier exhausted her Title VII administrative remedies and received the requisite "right-to-sue" letter.

3. She also claimed violations of the California Constitution, but since she has not raised these issues on appeal, they are not before us.

4. Although the court's findings of fact and conclusions of law do not expressly state that a prima facie Title VII case had been proved, such a finding is implicit in the court's conclusion that valid defenses were established by the district.

5. Although deLaurier has not drawn our attention to it, we take notice of the Equal Employ-

conclusion is based upon a series of recent Supreme Court decisions.

*Geduldig v. Aiello, supra,* 417 U.S. 484, 94 S.Ct. 2485, 41 L.Ed.2d 256, and the subsequent decision in *General Electric Co. v. Gilbert, supra,* 429 U.S. 125, 97 S.Ct. 401, 50 L.Ed.2d 343, held that an employer violates neither the Fourteenth Amendment nor Title VII by refusing to include pregnancy disability coverage in an otherwise nearly-comprehensive disability-benefits program. The Court reasoned that since the offered insurance benefits were of equal value to men and women, the plan's failure to extend an additional benefit of special worth to women was simply "not a gender-based discrimination at all." *Id.* at 136, 97 S.Ct. at 408.

Further discussion of what constitutes sex discrimination was provided in *Nashville Gas Co. v. Satty, supra,* 434 U.S. 136, 98 S.Ct. 347, 54 L.Ed.2d 356, in which the Court found a Title VII violation in an employer's policy of depriving women returning from maternity leave of their previously accumulated seniority. This practice, explained the Court,

> not merely [fails] to extend to women a benefit that men cannot and do not receive, but  .  .  .  impose[s] on women a substantial burden that men need not suffer. The distinction between benefits and burdens is more than one of semantics. We held in *Gilbert* that § 703(a)(1) did not require that greater economic benefits be paid to one sex or the other "because of their different roles in the scheme of existence," *Gilbert, supra,* 429 U.S., at 139, 97 S.Ct., at 410, n.17. But that holding does not allow us to read § 703(a)(2) to permit an employer to bur-

den female employees in such a way as to deprive them of employment opportunities because of their different role.

*Id.* at 351 (footnote omitted).[6]

These cases lead to the conclusion that requiring pregnant teachers to go on leave at the commencement of the ninth month of pregnancy states a prima facie case under Title VII. *Geduldig* and *Gilbert* make clear that not every *distinction* drawn on the basis of pregnancy is a *discrimination*; but *Satty* teaches that if discrimination against pregnant women *is* found, then, because the ability to become pregnant is inherently and exclusively linked to the female sex, this constitutes discrimination against women generally. The essential question, therefore, is not merely whether pregnancy is made a classifying factor, but whether discrimination has occurred.

■ From *Geduldig, Gilbert,* and *Satty* we learn that sex discrimination results when the opportunities or benefits offered by the employer to one gender are less valuable or more restricted than those offered to the other. Conversely, when existing benefits and opportunities are offered equally to men and women, no sex discrimination occurs, even when additional benefits that might have been particularly valuable to one sex are withheld. Since it is plain that mandatory maternity leave is not the withholding of a potential benefit, but is a restriction on pregnant women's employment opportunities, it follows that such a policy does constitute a gender-based discrimination. We must therefore inquire whether the district raised any valid defenses to justify this discrimination.

---

ment Opportunity Commission's Guidelines on Discrimination Because of Sex, 29 C.F.R. § 1604 *et seq.* (1977). Section 1604.10 provides that policies excluding employees from employment because of pregnancy are "in prima facie violation of Title VII." Assuming this regulation is valid and applicable here, we do not disagree with it. The regulation does not say, of course, that such a prima facie case cannot be rebutted with valid defenses.

**6.** The record does not make clear whether de-Laurier was proceeding under 42 U.S.C.

§ 2000e–2(a)(1), § 2000e–2(a)(2), or both, which are, respectively, the current versions of sections 703(a)(1) and 703(a)(2) of the Civil Rights Act of 1964. The thrust of the quoted statement from *Satty* is directed specifically to section 703(a)(2). We do not believe, however, that the Court intended to restrict to section 703(a)(2) its holding that a discriminatory burden on pregnant women is illegal. Thus, the finding of a discriminatory burden states a prima facie case under either of the two sections.

Title VII provides for two related defenses raised by the district in this case.[7] The first, commonly referred to as the "business necessity" or "job relatedness" defense, is discussed in detail in *Griggs v. Duke Power Co.*, 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971), a case in which a high school diploma requirement and a written examination which excluded a disproportionately high number of Blacks from employment opportunities were found invalid under Title VII. In deciding what showing would be required to defend such an examination, the Court declared that "[t]he touchstone is business necessity. If an employment practice which operates to exclude Negroes cannot be shown to be related to job performance, the practice is prohibited." *Id.* at 431, 91 S.Ct. at 853.

The Court has given the job relatedness defense a broad application, using it as a standard against which to measure discriminations far different from the diploma requirement and written examination at issue in *Griggs*. In *Dothard v. Rawlinson, supra*, 433 U.S. 321, 97 S.Ct. 2720, 53 L.Ed.2d 786, for example, statutory height and weight requirements that screened out a disproportionately high number of women applying for jobs as prison guards were challenged under Title VII. Drawing directly upon the job relatedness defense as developed in *Griggs*, the Court in *Dothard* found the requirements invalid under that standard. Speaking in terms of "discriminatory employment practice[s]" generally, *id.* at 331 n.14, 97 S.Ct. 2720, 2728, and not restricting itself to written examinations, the Court in *Dothard* stated that the successful invocation of the job relatedness defense requires a showing that the practice in question is "necessary to safe and efficient job performance." *Id.*

*Satty* similarly illustrates the expansive application of this defense in Title VII actions; there the Court stated that the deprivation of seniority benefits would have been legal had it been shown to pass the business necessity (job relatedness) test of *Griggs*. 98 S.Ct. at 351–52.

It is thus apparent that this defense applies to more than ability tests alone. Indeed, the Court's use of it suggests that virtually any prima facie case under Title VII may be rebutted as job related or necessary to business if, as it was put in *Dothard*, it is "shown to be necessary to safe and efficient job performance." 433 U.S. at 331 n.14, 97 S.Ct. at 2728.

■ The second defense is found in section 703(e) of Title VII, 42 U.S.C. § 2000e–2(e):

[I]t shall not be an unlawful employment practice for an employer to hire and employ employees . . . on the basis of . . . sex . . . in those certain instances where . . . sex . . . is a bona fide occupational qualification reasonably necessary to the normal operation of that particular business or enterprise . . . .

It is unnecessary for us, however, to analyze the BFOQ defense if the business necessity test is met. We, therefore, now turn to the record to determine whether, as the trial judge specifically stated in his conclusions of law, the district's mandatory leave policy "is justified by reasonable business necessity."

The court's findings of fact are not phrased precisely in the "safe and efficient performance" language quoted above from *Dothard*, which had not been decided when this case was tried, but taken as a whole, they adequately express the same idea.[8]

**7.** The most general statement of the defense that will rebut a prima facie Title VII case is found in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), where it is said that the employer's burden is to "articulate some legitimate, nondiscriminatory reason" for the conduct constituting the prima facie case of discrimination. The two defenses discussed in the text are important examples of "nondiscriminatory reasons."

**8.** For example, the findings of fact speak of "a possibility of serious dangers to the health of the mother and her child during the ninth month of pregnancy," of the "declining ability of a teacher to perform the multifarious duties of a teacher as the date of delivery approaches," of "the need to find qualified substi-

We thus believe that the trial judge was applying the correct legal standards when he concluded that the district had successfully raised the job relatedness (business necessity) defense.

There remains the important question, of course, whether the district court's findings of fact are "clearly erroneous" under Fed.R. Civ.P. 52(a); even if correct legal principles were employed, the facts to which they are applied must be supported by the record.

Our scope of review of the district court's findings of fact is a relatively limited one. In the oft-quoted language of the Supreme Court:

> A finding is "clearly erroneous" when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.

*United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948). Similarly,

> where the evidence would support a conclusion either way but . . . the trial court has decided it to weigh more heavily for the defendant[,] [s]uch a choice between two permissible views of the weight of evidence is not "clearly erroneous."

*United States v. Yellow Cab Co.*, 338 U.S. 338, 342, 70 S.Ct. 177, 179, 94 L.Ed. 150 (1949).

We acknowledge that the factual questions before the district judge were sometimes close and difficult. Competent and persuasive witnesses testified for each side. But viewing the record as a whole, and giving "due regard . . . to the opportunity of the trial court to judge of the credibility of the witnesses" as Rule 52(a) requires, we are left far from a conviction that an error was made; indeed, we think the district judge's assessment of the facts is definitely supportable. We are therefore obliged to sustain his decision that the district successfully raised the job relatedness defense against deLaurier's attack on the mandatory maternity leave policy.

The district presented evidence of two basic facts in support of its defenses: (1) that requiring teachers to go on leave at the beginning of the ninth month of pregnancy is necessary to the administrative and educational objectives of the district; and (2) that the mandatory leave rule is justified by the impaired physical condition and abilities of such teachers. The trial court accepted both factual positions. If either can be sustained as not clearly erroneous, we must affirm the resultant conclusion of the trial judge in favor of the district on the mandatory leave issue. .

With respect to its administrative and educational interests, the district presented the testimony of several of its administrators to the effect that finding qualified substitutes to cover teacher absences of more than a day or so is both difficult and important to the welfare of the students. This is particularly so since many teachers in the district teach a combination of subjects, requiring a substitute with competence in those same areas.[9] The district's

---

tutes since a substitute's performance over several weeks time has significant impact upon the education of students," and of the "sufficient lead time and a date certain upon which employment is to begin [that are] required for procurement of qualified, long-term substitutes." Such language taken as a whole is substantively similar to "reasonably necessary to safe and efficient performance of job duties."

Significantly, the court's findings of fact do incorporate the operative terms of section 2000e–2(e) itself; finding number 27 states that the mandatory leave policy is "reasonably necessary to the operation of the district."

9. For example, the district's Director of Personnel Administration testified:

> Teachers are not teachers; they are teachers of something or of some particular area. Replacement teachers are not available in all subject fields. There are many fields in special education in which the number of applicants is very small. There are other teaching fields in which the number of applicants is large.

> Unfortunately, teaching assignments in our schools are not uniform. Many teachers are asked to teach more than one subject field. Many teachers have combinations of assignments which are extremely difficult for us to fill. If we are not able to plan in advance and

Director of Personnel Administration testified that the district worked hard to find adequate replacements for teachers who would be gone for extended periods, and that not knowing a date certain on which a substitute would begin would seriously hamper these efforts. These facts were corroborated by the testimony of principals from a high school and a junior high school within the district. These witnesses stressed that it was the interests of the students in the continuity and quality of instruction as well as the administrative requirements of the district that prompted their concern.

Consistent with the emphatic testimony of her own medical experts, deLaurier does not dispute that it is impossible to predict with accuracy when a baby will be born.[10] deLaurier's own delivery, which occurred 17 days in advance of the earliest date predicted by her doctor—and which delivery was stated by him to be "absolutely" normal in every respect—is vivid evidence of this universally-recognized uncertainty.

deLaurier presented no witnesses or evidence of her own in support of her contention that the educational goals and administrative realities of the district did not justify the ninth-month rule. We find nothing in the testimony of the district's witnesses on cross-examination that undermines the conclusion reached by the district court. Certainly, as to this factual issue, the district judge was not clearly erroneous.

This factual resolution is sufficient for us to accept the finding that the leave policy is necessary to the administrative and educational objectives of the district and, therefore, we can affirm the conclusion that a business necessity was demonstrated. That business necessity conclusion, alternatively, can be affirmed on the basis that the leave policy is justified by the impaired physical condition and abilities of pregnant teachers during the ninth month.

This second basic factual issue pertinent to the district's defense is essentially framed as follows: whether the physical condition of a teacher in her ninth month of pregnancy justified the district's policy. The district argued that its rule could be defended in part by the decrease in effectiveness of nine-months pregnant teachers. In support of this proposition they offered expert medical testimony that "the progressive increase in . . . girth, [the] loss of agility, and [the] built-in awkwardness that goes with the increased size of the patient" adversely affect the mobility and balance of a pregnant woman in her ninth month. In addition, school administrators testified that in their personal experience, pregnant teachers were sometimes rendered less able because of fatigue, increased irritability, awkwardness, etc. to perform their duties as capably as otherwise.

deLaurier countered with the testimony of two doctors, who professed acquaintance with the demands placed on teachers, to the effect that a normally pregnant woman should experience no particular handicap in her work. Both these witnesses stated, however, that their prime consideration was the welfare of their patients, not the interests of the patients' employers. deLaurier's personal physician stated that his opinion that a teacher could perform capably during the ninth month had to be based entirely upon what his patient told him, and that as long as she thought she was performing adequately, he would not disagree.

On the record before us, we cannot say that the district judge clearly erred in concluding that "there is a declining ability of a teacher to perform the multifarious duties of a teacher as the date of delivery approaches." The evidence, though not uncontradicted, is such that we cannot say that the finding was clearly erroneous.

---

have a specific time of separation, we aren't able to find people who are qualified in all these fields.

10. The first of deLaurier's two medical witnesses testified that close to a hundred percent of normal births would occur within "plus or minus two weeks" of the expected delivery date; the second was less confident of the ability to predict, stating that "three weeks on each side" of the predicted date would be required to encompass 98 percent of normal births.

■ Since this case has been pending on appeal, the State of California has enacted legislation inconsistent with the district's ninth-month rule, and with its sick leave benefits rule as well. Cal.Educ.Code §§ 13456, 13468 (West Supp.1977), as amended by Stats. 1975, ch. 914, §§ 1, 2. This raises the question whether the district's otherwise valid defense is somehow affected by this subsequent change in the law. We hold that it is not.

In California, statutes are not generally given retroactive application.[11] We find nothing in the specific legislation at issue here purporting to avoid that general rule. Thus, the new laws are of no direct benefit to deLaurier.

Based on the facts before him, the district judge concluded that the mandatory leave rule was a business necessity. The state legislature has either disagreed with that conclusion or decided to impose upon local school districts requirements more burdensome than it believes federal law compels. Under either view, we do not believe the trial court's judgment should be disturbed. We cannot conclude from the record in this case, which we are bound to regard as the exclusive source of the facts, that the district was required by either Title VII or, as we explain below, the Fourteenth Amendment to abolish the ninth-month mandatory leave policy. The evidence, as the district judge found, was to the contrary.

We conclude that the district successfully raised the business necessity defense against deLaurier's Title VII challenge to the mandatory leave policy, and that the recent state statutory changes do not alter this result. This shifts the burden back to deLaurier to prove that the district was discriminatorily motivated or that less discriminatory means could have been used to protect the district's interest. No such showing was made or even attempted.[12] Aside from the limited remand, the denial of relief under Title VII must be affirmed.

## B. The Fourteenth Amendment

deLaurier also challenges the mandatory leave policy under the Fourteenth Amendment. Although the record is not entirely clear in this respect, she apparently relies upon both the Due Process Clause and the Equal Protection Clause. We discuss these separately.

### 1. The Due Process Clause

■ In *Cleveland Board of Education v. LaFleur*, 414 U.S. 632, 94 S.Ct. 791, 39 L.Ed.2d 52 (1974), the Court held that requiring a teacher to take maternity leave at the end of the fifth month of pregnancy violated the Fourteenth Amendment's guarantee of due process. Since *LaFleur* presents facts highly similar to those before us here, the decision deserves close attention.

The analysis in *LaFleur* proceeded in two steps. First, the Court inquired whether the mandatory leave policy "needlessly, arbitrarily, or capriciously impinge[d] upon [the decision to bear a child, a] vital area of a teacher's constitutional liberty." *Id.* at 640, 94 S.Ct. at 796. If so, the Due Process Clause was offended. Second, even if the rule was not totally arbitrary, if it imposed

11. The law in California appears to be that, absent a legislative mandate to the contrary, " '[a] statute will not be given a retroactive construction by which it will impose liabilities not existing at the time of its passage, or which will affect an existing liability to the detriment of defendant; . . .' (82 C.J.S. 995, Statutes, § 418.)" *Helm v. Bollman*, 176 Cal.App.2d 838, 841, 1 Cal.Rptr. 723, 725 (1959). *Accord, Balen v. Peralta Jr. Coll. Dist.*, 11 Cal.3d 821, 828, 114 Cal.Rptr. 589, 593, 523 P.2d 629, 633 (1974); *Reeves v. Super. Ct.*, 36 Cal.App.3d 291, 293, 111 Cal.Rptr. 390, 391 (1973); *Parking Auth. v. Nicovich*, 32 Cal.App.3d 420, 424–25, 108 Cal.

Rptr. 137, 139 (Dist.Ct.App.1973); 45 Cal. Jur.2d *Statutes* § 26, at 552–54 (1958).

12. In particular, deLaurier has not argued that the district could have protected its interests by allowing her to set a firm cutoff date after consultation with her doctor. deLaurier's express intention was to work until the onset of labor; obviously, she could not at once adhere to that plan and provide the district with a date certain for her departure. Moreover, it is evident that a date "certain" set much later than the beginning of the ninth month of pregnancy would, in fact, be very uncertain.

an "irrebuttable presumption that unduly penalize[d]," *id.* at 648, 94 S.Ct. 800, the teacher's decision by not allowing her to prove that the reasons for the rule did not apply in her case, due process was violated.

Under the first step of the analysis, the Court found that with respect to the defendant school board's interests in continuity of education and administrative regularity the policy was irrational since, as often as not, the end of the fifth month fell mid-semester and the term could easily have been completed before the risk of childbirth became appreciable. The Court also observed that a specific cutoff date could be set later in pregnancy with no adverse administrative consequences.

As the majority in *LaFleur* expressly recognized, the same conclusion does not follow when the cutoff date is set "much later during pregnancy." *Id.* at 642, 94 S.Ct. 797. Where it is the beginning of the ninth month rather than the end of the fifth that triggers the mandatory leave, needless disruption of a semester is much less likely.[13] Moreover, according to all the medical testimony presented at the trial, and as deLaurier's own case dramatically illustrates, setting the leave date significantly later than the beginning of the ninth month greatly diminishes the possibility that school authorities will be able to rely upon any firm date at all. Thus, contrary to the situation in *LaFleur*, the district's ninth-month rule is not needless and arbitrary. Indeed, it is wholly rational for the district to terminate the teacher's freedom of choice at just that point where the unpredictability of pregnancy is most likely to come into play.

In the second step of its analysis, *LaFleur* acknowledged that while the school board's interest in preventing teachers physically impaired by pregnancy from teaching was both legitimate and served by its fifth-month rule, the rule was nevertheless defective because it conclusively presumed that LaFleur herself was thus impaired without providing her with a chance to prove otherwise. Such a conclusive presumption was said to be inconsistent with due process.

At first blush this reasoning appears to apply equally to deLaurier, for under the district's ninth-month rule, she was given no opportunity to prove that in fact she was capable of continuing to teach past the normal cutoff date. But the Court in *LaFleur* made it clear that its analysis was not without exceptions. Indeed, as an illustration of a situation that might well escape the irrebuttable presumption analysis, the Court outlined what is essentially deLaurier's case:

> This is not to say that the only means for providing appropriate protection for the rights of pregnant teachers is an individualized determination in each case and in every circumstance. We are not dealing in these cases with maternity leave regulations requiring a termination of employment at some firm date during the last few weeks of pregnancy.

*Id.* at 647 n.13, 94 S.Ct. at 799. Although it expressly reserved decision on this question, the Court suggested some of the facts that might justify a mandatory leave policy "during the last few weeks of pregnancy":

> for example, widespread medical consensus about the "disabling" effect of pregnancy on a teacher's job performance during these latter days, or evidence showing that such firm cutoffs were the only reasonable method of avoiding the possibility of labor beginning while some teacher was in the classroom, or proof that adequate substitutes could not be procured without at least some minimal lead time and certainty as to the dates upon which their employment was to begin.

*Id.*

As the expert medical testimony in this case illustrates, of course, there is no "widespread medical consensus about the 'disabling' effect of pregnancy on a teacher's job

---

**13.** In this case, for example, it is undisputed that even if deLaurier had been allowed to teach until the onset of labor, as she desired, and even if her baby had not been born early, the semester would nevertheless have been interrupted. Thus, the ninth-month rule did not frustrate one of the policies it was designed to protect, as was so in *LaFleur.*

performance" during the ninth month of pregnancy. But the record does contain evidence at least approaching the other factors that *LaFleur* suggests may place a case outside the scope of the conclusive presumption analysis.[14] Without a definite cutoff date, the district's ability to procure adequate substitutes for the duration of a maternity leave could be seriously hampered, and setting the date later in pregnancy than the beginning of the ninth month would increase dramatically "the possibility of labor beginning while some teacher was in the classroom."[15] We believe that with the record that was before him, and in light of the statements from *LaFleur* quoted above, the district judge was entitled to conclude that the ninth-month maternity leave policy was not condemned by the irrebuttable presumption analysis.[16]

## 2. *Equal Protection Clause*

■ A more traditional approach to determining the constitutional validity of the district's mandatory leave policy is under the Equal Protection Clause of the Four-teenth Amendment. This, in fact, was the analysis employed by Justice Powell who concurred separately in *LaFleur*. He found that the fifth-month rule in *LaFleur* was too tenuously connected to the school board's interests to satisfy even the "rational basis" or "minimum scrutiny" test of equal protection. His judgment that the mandatory leave rule in that case was irrational was based largely on the same factors that led the majority to the same conclusion in the context of its irrebuttable presumption analysis. As did the majority, Justice Powell explicitly foresaw the facts of deLaurier's case. He believed the factors the majority implied were necessary to justify the leave policy in such a case were too strict, but that even under the majority's view, "a four-week prebirth period would be acceptable." *Id.* at 656 n.5, 94 S.Ct. at 804.

In its recent sex discrimination cases the Court has tended to state the equal protection test somewhat differently than has been common in "rational basis" equal pro-

**14.** Significantly, the Court's list of such factors is clearly intended to be illustrative only. We do not read it to be an exhaustive list of factors capable of justifying mandatory maternity leave rules or to set forth necessary conditions for such a justification.

**15.** deLaurier's desire, of course, was to do precisely what *LaFleur* suggests may be prohibited—to teach until the onset of labor. The issue before us, however, is not whether she should have been allowed to work until labor began, but whether requiring her to go on leave at the beginning of the ninth month was legal.

**16.** There is a reinforcing reason for which we decline to extend the *LaFleur* analysis to this case. Although no Supreme Court decision has formally overruled *LaFleur* or other "irrebuttable presumption" decisions, it is apparent that the use of that doctrine has been severely limited. Justice Rehnquist dissented strongly in *LaFleur*, charging that the Court's use of the doctrine was "in the last analysis nothing less than an attack upon the very notion of lawmaking itself." 414 U.S. at 660, 94 S.Ct. at 806. Shortly thereafter, Justice Rehnquist wrote for the Court in *Weinberger v. Salfi*, 422 U.S. 749, 95 S.Ct. 2457, 45 L.Ed.2d 522 (1975), which expressly and emphatically declined to extend the use of irrebuttable presumption analysis. *Id.* at 770–74, 95 S.Ct. 2457. Significantly, Justice Stewart, who had authored *LaFleur*, joined the *Salfi* majority.

We are aware of no cases since *Salfi* which have relied upon this analysis, with the exception of one brief per curiam opinion in which the facts were squarely governed by *LaFleur*. *Turner v. Department of Emp. Security*, 423 U.S. 44, 46, 96 S.Ct. 249, 46 L.Ed.2d 181 (1975). The Court has declined recent invitations to revive the doctrine. In *Fiallo v. Bell*, 430 U.S. 787, 791, 97 S.Ct. 1473, 52 L.Ed.2d 50 (1977), the appellants raised the conclusive presumption issue, but the Court refused to deal with it in its analysis. Similarly, in *Ohio Bureau of Emp. Serv. v. Hodory*, 431 U.S. 471, 490 n.18, 97 S.Ct. 1898, 52 L.Ed.2d 513 (1977), the Court acknowledged that an irrebuttable presumption argument had been raised, but summarily disposed of it in a footnote. In *Usery v. Turner Elkhorn Mining Co.*, 428 U.S. 1, 22–24, 96 S.Ct. 2882, 49 L.Ed.2d 752 (1976), such an argument was rejected with a reference to *Salfi*, and in *First National Bank v. Bellotti*, 435 U.S. 765, 98 S.Ct. 1407, 1413, 55 L.Ed.2d 707 (1978), a conclusive presumption argument raised by the parties in the lower court was not discussed by the Supreme Court. *Cf. Elkins v. Moreno*, 435 U.S. 647, 98 S.Ct. 1338, 55 L.Ed.2d 614 (1978) (decision whether to limit or overrule *Vlandis v. Kline*, 412 U.S. 441, 93 S.Ct. 2230, 37 L.Ed.2d 63 (1973), an important irrebuttable presumption case, avoided).

tection decisions of the past.[17] In *Craig v. Boren*, 429 U.S. 190, 197, 97 S.Ct. 451, 457, 50 L.Ed.2d 397 (1976), for example, the Court said "that classifications by gender must serve important governmental objectives and must be substantially related to achievement of those objectives." Whether or not this so-called "intermediate level of scrutiny" [18] is in fact stricter than the more traditional "rational basis" standard, we are convinced that the district's ninth-month mandatory leave policy passes equal protection muster. In our discussion of the district's defenses under Title VII, we detailed the important interests the rule was designed to serve and discussed the evidence in the record demonstrating that it in fact substantially protected those interests. Under the Equal Protection Clause, nothing more is required.

### III. *The Sick Leave Benefits Policy*

■ The second policy of the district to which deLaurier objects is that which forbade the use of accumulated sick leave benefits for maternity leave. The district judge upheld this rule on the district's motion for summary judgment, believing that result to be required by *Geduldig v. Aiello, supra*, 417 U.S. 484, 94 S.Ct. 2485, 41 L.Ed.2d 256. We have previously discussed the holdings of *Geduldig* and the subsequent cases of *Gilbert* and *Satty*. To determine whether the district's sick leave benefits policy is discriminatory we must inquire whether, as in *Geduldig* and *Gilbert*, it merely fails to extend an additional benefit to women against a background of sexually equal treatment, or whether, as in *Satty*, it imposes a substantial burden on females " 'because of their different roles in the scheme of existence.' "

From the fairly complete description of the sick leave benefits policy contained in the record, we conclude that it does discriminate on the basis of sex. Several factors distinguish it from the plans upheld in *Geduldig* and *Gilbert*. In those cases, the benefits in question were simply possible inclusions in insurance coverage funded by premiums deducted equally from the salaries of men and women or paid by the employer. They were thus benefits which the plaintiffs hoped to receive, but to which they could in no sense claim a contractual entitlement. The sick leave benefits involved in this case, by contrast, constitute a part of the compensation paid to the teacher. The number of paid sick leave days enjoyed by a teacher depends upon her length of service. All earned sick leave days accumulate throughout the year, and some of them accumulate from year to year, without limit.[19] Teachers having unused sick leave days at retirement may claim them at that time. Thus, the district's sick leave benefits are far different from an item of insurance coverage in that they represent a vested right that can eventually be claimed by the employee.

The district argues that maternity leave is properly included in the category of other long-term leaves for which sick leave benefits are not available. We agree that this inclusion lends an element of rationality to the district's plan, and we also take note of the fact that, unlike the plaintiffs in *Satty* whose previously earned seniority benefits were actually taken from them, the district's teachers returning from maternity retained their accumulated sick leave days for future use.

But other facts cut against the district. Of the other kinds of long-term leave, at least one—that taken for industrial acci-

---

17. Typical statements of the "rational basis" test are found in *McGowan v. Maryland*, 366 U.S. 420, 81 S.Ct. 1101, 6 L.Ed.2d 393 (1961), and *McDonald v. Board of Election Comm'rs*, 394 U.S. 802, 89 S.Ct. 1404, 22 L.Ed.2d 739 (1969). In the former, the Court said: "[a] statutory discrimination will not be set aside if any state of facts reasonably may be conceived to justify it." 366 U.S. at 426, 81 S.Ct. at 1105. Similarly, the Court said in *McDonald* that

"statutory classifications will be set aside only if no grounds can be conceived to justify them." 394 U.S at 809, 89 S.Ct. at 1408.

18. J. Nowak, R. Rotunda, J. Young, Constitutional Law 616 (1978).

19. "Full-salary" sick leave days accumulate from year to year; "half-salary" sick leave days do not.

dents—was covered by sick leave benefits; thus it cannot be said that all long-term leaves were consistently made ineligible for the benefits. More importantly, under the mandatory maternity leave policy, pregnant teachers were required to stop working earlier than they might otherwise choose to do. We have decided above that the district was justified in requiring such a leave of absence, but that does not make defensible every limitation on a pregnant teacher's use of her compensation that might be linked to such a mandatory leave. On the contrary, just as the maternity leave policy itself was in prima facie violation of Title VII, so was the concomitant prohibition placed on the use of sick leave benefits, for it constituted a clear restriction on the employment benefits of pregnant teachers only. That is a discriminatory burden within the meaning of *Satty.*

The district judge was therefore incorrect when he ruled that the district's sick leave benefits policy was nondiscriminatory. That conclusion, as *Satty* itself recognizes, "does not end the inquiry," however. 98 S.Ct. at 351. If the district can defend its policy in the manner described in part II above, the rule may still be valid under Title VII.

Since the district court granted summary judgment in favor of the district solely on the basis of *Geduldig,* holding, in effect, that deLaurier had failed to establish a prima facie case, the issue of the district's defenses was never reached. In an affidavit in support of its motion for summary judgment the district claimed that allowing sick leave benefits for maternity leave would drastically increase the costs of administering its program. Why that should be so is not readily apparent, since, as we have said, the district "owes" the full measure of at least some of those benefits to all of its teachers at some point before retirement.[20] But the district must be given the opportunity to develop this theory or any other it believes constitutes a valid defense to its sick leave benefits policy under Title VII.

We affirm the district court's conclusion that the mandatory maternity leave policy was valid under Title VII and the Fourteenth Amendment. With respect to the sick leave benefits policy, we reverse and remand for further proceedings consistent with this opinion.[21] Should deLaurier prevail on this issue, the district court should consider her request for attorney's fees under the law governing such awards.[22]

AFFIRMED IN PART, VACATED AND REMANDED IN PART, REVERSED AND REMANDED IN PART.

HUFSTEDLER, Circuit Judge, concurring and dissenting:

The school district's policy requiring all pregnant teachers to take an involuntary, unpaid leave of absence one month before their expected date of confinement violated Title VII. The majority correctly decides that deLaurier made out a *prima facie* case of discrimination, but the majority affirms the district court's decision on the mandato-

---

**20.** It may be that since half-salary sick leave days are lost if not used during the year in which they are earned, see note 20, *supra,* some pregnant teachers could be expected to claim these benefits for their maternity leave, allowing the full-salary days to accumulate from year to year, and increasing district expenses accordingly. There might also be other expenses inherent in the payment of sick leave benefits for maternity leave of which we are unaware. Thus, we cannot at this point say that the district has no hope of defending its sick leave benefits policy from deLaurier's Title VII attack.

**21.** Because of our determination of the Title VII issue, we do not decide the question of the validity of the sick leave benefits policy under the Fourteenth Amendment. If this issue ultimately needs to be reached, it should be decided in the first instance by the trial court.

**22.** Should the attorney's fees issue become relevant, consideration must, of course, be given to 42 U.S.C. § 2000e–5(k). The court should also take note of the policy announced in *Schaeffer v. San Diego Yellow Cabs, Inc.,* 462 F.2d 1002, 1008 (9th Cir. 1972), which states that "the amount of the award should . . . be proportionate to the extent to which the plaintiff prevails in the suit." *See generally Fountila v. Carter,* 571 F.2d 487, 495–96 (9th Cir. 1978).

ry termination issue by saying that factual findings, which are not clearly erroneous, established a business necessity defense. That conclusion rests on a misreading of controlling principles of law. In my view, no remand is justified on the denial of sick leave issue because, as a matter of law, the school district cannot establish a defense of business necessity based upon the additional expense of including pregnancy in its sick leave coverage.

## I

The school district's effort to justify its mandatory termination date as a business necessity failed because the district did not prove the job-relatedness of the termination date as it specifically related to teachers over eight months pregnant, and the record showed that there were alternative methods, without a similarly undesirable discriminatory effect, whereby the district could have had ample notice of intended leave to fill its business purpose of acquiring substitute teachers.

The district court did not apply the correct job-relatedness test, and, therefore, its findings of fact are not directly relevant to the business necessity defense issues. To the extent that they are relevant, however, the findings are not supported by the evidence in the record, and they are, therefore, clearly erroneous.

To establish a *prima facie* violation of Title VII,[1] a plaintiff need only show that the employment practice in question operates "in a significantly discriminatory pattern." (*Dothard v. Rawlinson* (1977) 433 U.S. 321, 329, 97 S.Ct. 2720, 53 L.Ed.2d 786; *Albemarle Paper Co. v. Moody* (1975) 422 U.S. 405, 425, 95 S.Ct. 2362, 45 L.Ed.2d 280.) Once a discriminatory effect is shown, the employer has the burden to justify the prac-

tice by proving that it is "necessary to safe and efficient job performance. . . ." (*Dothard v. Rawlinson, supra,* 433 U.S. at 332 n.14, 97 S.Ct. at 2728; *Nashville Gas Co. v. Satty* (1977) 434 U.S. 136, 143, 98 S.Ct. 347, 54 L.Ed.2d 356; *Griggs v. Duke Power Co.* (1971) 401 U.S. 424, 431–32, 91 S.Ct. 849, 28 L.Ed.2d 158.) Even if the employer establishes a business necessity for the practice, the plaintiff will nevertheless prevail by showing that alternative methods, without a similarly undesirable discriminatory effect, would serve the employer's legitimate interests as well as the challenged practice. (*Dothard v. Rawlinson, supra,* 433 U.S. at 329, 97 S.Ct. 2720; *Albemarle Paper Co. v. Moody, supra,* 422 U.S. at 425, 95 S.Ct. 2362.)

Employment practices that disadvantage pregnant women are a violation of Title VII if those practices have a "discriminatory effect," in that their necessary operation disproportionately burdens women as a class. (*Nashville Gas Co. v. Satty, supra,* 434 U.S. 136, 98 S.Ct. 347, 54 L.Ed.2d 356; *General Electric Co. v. Gilbert* (1976) 429 U.S. 125, 97 S.Ct. 401, 50 L.Ed.2d 343.) A gender-based discriminatory effect arises from distinctive treatment of pregnancy not only when employers' practices are a pretext for discriminating against women, but also where the practices impose on women as a class "a substantial burden that men need not suffer" because of "their different role" in the reproductive process. (*Nashville Gas Co. v. Satty, supra,* 434 U.S. at 142, 98 S.Ct. at 351.)

"A prima facie case of discrimination can be made by showing disability due to pregnancy, action based on that disability which adversely affects employment opportunities and that others were not similarly treated when suffering temporary disabilities."

---

1. The Equal Employment Opportunity Act, Title VII, Section 703 of the Civil Rights Act of 1964 (42 U.S.C. § 2000e–2(a) provides in pertinent part:

    "(a) It shall be an unlawful employment practice for an employer— .

    (1) to fail or refuse to hire or to discharge . . . or otherwise to discriminate against any individual with respect to his compensa-

tion, terms, conditions, or privileges of employment, because of such individual's . . . sex . . . .; or

    (2) to limit, segregate, or classify his employees . . . in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's . . . sex . . . .'"

(*Roller v. City of San Mateo* (9th Cir. 1977) 572 F.2d 1311, 1313.)

deLaurier established a *prima facie* case under Title VII. The district's mandatory maternity leave policy did not simply deny pregnant women a benefit that other employees did not receive. Rather, it imposed a special burden on pregnant women by placing restrictions on their employment opportunities which were inapplicable to any other class of teachers taking leaves of absence. All other leaves, whether health-related or not, were voluntary. All health leaves but those for pregnancy began on a date chosen individually by the teacher and lasted for a period determined by the individual teacher's needs. Only in the case of pregnancy did the district either require a leave or enforce a uniform date for beginning the leave. The mandatory leave policy not only deprived pregnant teachers of their opportunity to earn a living during the leave period, but also imposed additional losses, such as the inability to acquire tenure, deprivation of health and welfare benefits (granted only for leaves with pay), and, at the time of deLaurier's termination, the lack of any assurance of being returned to the same position upon expiration of the leave.

The mandatory leave policy burdened only women teachers. It imposed the same kinds of disproportionate burdens on the disadvantaged class (women teachers) as the practices that were invalidated in *Nashville Gas Co. v. Satty, supra,* 434 U.S. 136, 98 S.Ct. 347, 54 L.Ed.2d 356 (divesting only pregnant women of seniority); *Dothard v. Rawlinson, supra,* 433 U.S. 321, 97 S.Ct. 2720, 53 L.Ed.2d 786 (height and weight standards disproportionately screened out women); and *Albemarle Paper Co. v. Moody, supra,* 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 and *Griggs v. Duke Power Co., supra,* 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (tests barred primarily blacks from employment).

The burden thereupon shifted to the district to prove that business necessity justified its disadvantageous treatment of pregnant women. The business necessity defense is, of course, available regardless of the nature of the practice under review but it is not, as the majority seems to imply, a defense that is easy to establish. On the contrary, it is a highly restrictive and carefully limited defense. The employer must show that the practice is "necessary to safe and efficient job performance . . . ." (*Dothard v. Rawlinson, supra,* 433 U.S. at 332 n.14, 97 S.Ct. at 2728.) The defense cannot be established merely by a showing that it is administratively convenient to the employer, or even by a showing that other practices would be highly inconvenient. The employer must show that the practice in question is *specifically* required for the operation of the business. Evidence must be offered correlating the particular practice with factors relevant to the ability to perform the affected job. (*Dothard v. Rawlinson, supra,* 433 U.S. at 331, 97 S.Ct. 2720, 2728.) In *Dothard,* for example, the employer argued that height and weight requirements for prison guards were necessary because the job required physical strength. The Court held that the defense of business necessity was not thereby established because the employer did not produce evidence "correlating the height and weight requirements with the requisite amount of strength thought essential to good job performance." The Court emphasized the need for evidence "in specific justification of the . . . standards." (*Ibid.*) The business necessity defense is thus only available if it is shown that the requirement is sufficiently particularized that it "measure[s] the person for the job and not the person in the abstract." [2] (*Griggs v. Duke Power Co., supra,* 401 U.S. at 436, 91 S.Ct. at 856.)

The evidence shows that the district applied a mandatory leave policy only to preg-

---

**2.** An employment test given as a condition of hire or transfer, for example, must be "demonstrably a reasonable measure of job performance" on a particular job. (*Griggs v. Duke Power Co., supra,* 401 U.S. at 436, 91 S.Ct. at 856.) The test must be validated against particular jobs; it may be used for a job that has not been specifically studied only if there is "no significant difference" between that job and one against which the test has been validated. (*Albemarle Paper Co. v. Moody, supra,* 422 U.S. at 432, 95 S.Ct. 2362.)

nancy leaves. All other leaves of absence were voluntary, and advance notice was not required for any other health-related leave. The date for beginning all other kinds of leave was determined on an individualized basis, taking the needs of the particular employee into account. Therefore, the business necessity defense must be based on evidence that proves that the ninth month of pregnancy presents problems that are not presented in any of the earlier stages of pregnancy or in any other type of temporary disability, and that the problems thus presented are such that the safe and efficient operation of the school system requires that all teachers who are nine months pregnant be kept out of the schools. If the reasons advanced by the district for its policies are applicable equally to conditions to which the policy is not applied, then deLaurier has been treated disadvantageously as compared to others similarly situated.

The district tried to justify its policy as a business necessity on three grounds: (1) The administrative needs and educational goals of the district required that a date certain for beginning leave be known in advance to help the district in engaging substitute teachers; (2) a teacher entering the ninth month of her pregnancy becomes unable to perform her duties adequately; and (3) the health of the mother and child requires mandatory leave at the end of the eighth month. The district failed to offer evidence in specific justification of the job-relatedness of its employment cut-off date on any of these three grounds.

The contention that the school district needed ample time to find appropriate replacements for pregnant teachers is not a justification for compelling the teacher to leave work at the beginning of the ninth month of pregnancy. Of course, it is always convenient for an employer to know when any employee will be absent. Nothing in the evidence, however, suggested any reason why advance notification should be mandatory only for pregnancy and not, for example, for elective surgery. Even assuming that the district showed a business ne-

cessity for advance notice and the fixing of a date certain for the long-term substitute to begin work, this need could be fully and adequately served by an agreement between the teacher and the school district that her leave would begin on a particular date. In order to successfully rebut deLaurier's *prima facie* case, the district had to prove a business necessity for a uniform termination date at the beginning of the ninth month. Apparently my brethren believe that the evidence concerning the difficulty of predicting the exact date of confinement satisfies this requirement. It does not.

The district court found that 80 percent of all births would occur within "plus or minus one week" of the predicted date, and that 98 percent would occur within three weeks of the predicted date. There was uncontradicted testimony that half of the predicted error would occur before and half after the predicted date, and, of course, some of the early deliveries would occur before the ninth month. The court also found that 110 teachers in the San Diego Unified School District commenced maternity leaves in 1973–74. We may infer from these facts that in 1973–74 only 11 teachers in the district would be likely to give birth before one week prior to their predicted delivery date. Since the district's Director of Personnel Administration testified that fewer than six teachers that year had wanted to teach into the ninth month, the actual number of early deliveries would be considerably fewer—perhaps one or two. I cannot believe that this order of uncertainty justifies requiring all pregnant teachers to leave work four weeks before their expected delivery date. The evidence shows, at most, a business necessity for a termination date one week before the predicted date of confinement. Since unanticipated early onset of delivery was not shown to be in any respect different from other unanticipated temporary conditions which were handled routinely by the district without any notice whatever, the small number of cases in which birth occurred before a one-week cut-

off could be handled through the normal short-term substitute process.[3]

The district proved that advance notice and a date certain for commencing leave would be administratively convenient for the district. It did not show that the administrative needs and educational goals of the district *required* any form of mandatory leave, or any particular date for beginning the leave.

The district next argued that as pregnancy progresses, women become unable to do a good job of teaching because of irritability, lack of balance and agility, and fatigue. The district court found that "there is a declining ability of a teacher to perform the multifarious duties of a teacher as the date of delivery approaches." That finding does not aid the district for two reasons. First, the finding was not specifically related to the district's automatic eighth-month cutoff date, and thus failed to meet the *Dothard* standard. Second, the finding is not supported by the evidence in the record. No testimony of any kind was presented tending to prove that women in the ninth month of pregnancy were less competent as teachers than women in earlier stages of pregnancy, or less competent than other teachers who were not pregnant. Some anecdotal testimony was given by several school administrators and principals concerning their observations of pregnant teachers. Because the district's policy of mandatory leave precluded these witnesses from observing any teachers more than eight months pregnant, their testimony was irrelevant to prove the necessity for the eighth month date. Some administrators expressed fear that due to fatigue or fear of collisions, a teacher in the ninth month of pregnancy would decline to carry her fair share of the duties of hall and playground monitoring. No factual foundation for these opinions was cited. Similarly, the medical testimony did not establish that teachers in the ninth month of pregnancy were physically unable to perform their duties.

The testimony regarding inability to perform satisfactorily was further defective because it was not correlated with factors related to the performance of any particular teaching jobs. An employer may not avail itself of the business necessity defense unless the necessity is shown as to the particular job to which the practice is applied. (*Dothard v. Rawlinson, supra*, 433 U.S. at 331, 97 S.Ct. 2720; *Albemarle Paper Co. v. Moody, supra*, 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280; *Griggs v. Duke Power Co., supra*, 401 U.S. at 431, 436, 91 S.Ct. 849.) The San Diego Unified School District's policy was applied across the board to every teacher in the district. Specifically, it was applied to deLaurier, who was a junior high school language teacher with minimal responsibilities for supervising hallways and playgrounds. The testimony regarding increased girth and loss of agility involved difficulties experienced by elementary school teachers in bending over small desks and supervising strenuous outdoor recreation. These concerns were simply not relevant to deLaurier's job.

Finally, the district claimed that continued teaching during the final month of pregnancy increased risks to the health of the mother and child. Complications unique to pregnancy can, of course, occur at any time during a pregnancy. Expert witnesses for both the district and deLaurier testified that the most hazardous period of pregnancy was the first trimester when the danger of miscarriage is most acute. Some complications of pregnancy, including toxemia, premature rupture of the membranes, false labor, and premature separation of the placenta, tend to occur in the later stages of pregnancy. None of the expert witnesses testified that these unusual complications of pregnancy were more likely to occur among pregnant teachers who continued teaching than among other pregnant women.

The district court found: "Although serious complications unique to the ninth

**3.** See *Cleveland Bd. of Education v. LaFleur* (1974) 414 U.S. 632, 642 n.10, 94 S.Ct. 791, 39 L.Ed.2d 52.

month of pregnancy occur in only three percent of all pregnancies, the very duties required of teachers entail a possibility of serious dangers to the health of a mother and her child during the ninth month of pregnancy." This finding was not supported by the evidence, and is clearly erroneous. There was no testimony that any complication was *unique* to the ninth month of pregnancy. There was no testimony correlating teachers' duties with increased dangers to pregnant women.[4] The district court also found: "There is greater likelihood of injury to a mother and her child during the ninth month of pregnancy than before the ninth month of pregnancy." This finding is not supported by the evidence, and is irrelevant in the absence of any evidence that the risks are greater for pregnant women who are teaching than for those who are not.

Some kinds of jobs for some teachers may be hazardous during pregnancy, but the school district completely failed to prove that teachers in the school district generally, teachers in her particular school, or de-Laurier herself held jobs that entailed any such hazards or dangers.[5]

The district's justifications based on administrative convenience and decreasing ability to teach are virtually identical to those made, and rejected by the Supreme Court, in *Cleveland Bd. of Education v. LaFleur* (1974) 414 U.S. 632, 94 S.Ct. 791, 39 L.Ed.2d 52. The Court in that case invali-

dated a mandatory requirement that pregnant teachers take maternity leaves after the fifth month of pregnancy on the ground that the "irrebuttable presumption" that teachers were unfit to work after the fifth month was arbitrary. *(See also id.* at 651–57, 94 S.Ct. 791, Powell, J., concurring in result, applying an equal protection analysis.) The Court observed that the Board's interest in administrative convenience and in having physically fit teachers could be adequately served by the less intrusive means of having teachers give ample advance notice of their pregnancy and a "date certain" for termination, together with an individualized evaluation of their ability to perform their jobs. While the Court did not hold that uniform dates for maternity leaves were never permissible, it did hold that employers who chose such termination or leave practices would have to meet the heavy burden of proving that the particular method was justified by proof that pregnant women at the chosen stage of pregnancy could not adequately perform their jobs or that administrative considerations compelled use of the particular cut-off date chosen. (414 U.S. at 640–50, 94 S.Ct. 791.)[6]

Although *LaFleur* rested on constitutional grounds, it is nevertheless instructive because a mandatory leave policy that cannot pass due process muster necessarily fails to meet the more stringent standards of Title VII. Here, as in *LaFleur*, the school dis-

**4.** The only evidence that was remotely relevant to this issue was testimony that premature separation of the placenta, an extremely rare phenomenon, might be caused by a sharp blow to the abdomen. But there was no evidence that teachers performing their regular duties, whether pregnant or not, were subjected even occasionally to sharp blows to the abdomen. The sole mention of any physical contact between a student and a teacher was the testimony of a high school principal that he had been "jostled" while monitoring hallways. Ms. de-Laurier's school has no hallways; all classrooms are in individual buildings.

**5.** Teachers of physical education, mechanical and industrial arts, or other kinds of teaching duties that require physical agility, lifting, climbing, or other kinds of similar work may be classified differently if medical opinion exists that job performance will be lessened or risks

unduly increased after a certain stage of pregnancy. (*E. g.*, 7 FEP Cases 455 (1971) (no Title VII violation in requiring employee to leave at end of seventh month of pregnancy rather than the eighth, as the employee desired, where job involved filling orders for heavy materials, lifting, climbing ladders, riding forklifts, and other activities dangerous or difficult for a person in advanced stages of pregnancy).)

**6.** In a footnote, the Court indicated that a fixed, uniform date during the last few weeks of pregnancy might be justified by considerations such as "widespread medical consensus about the 'disabling' effect of pregnancy on a teacher's job performance during these latter days . . . ." (*Id.* at 647 n.13, 94 S.Ct. at 800.) The school district here failed to produce evidence of any such medical consensus.

trict offered no reason why the choice of a firm date by the teacher in consultation with her physician would not have served the administrative convenience of the school district as well as the date imposed by the district. The school district did not even attempt to prove that either administrative necessity or medical considerations required placing all pregnant teachers, no matter what their teaching assignments, on mandatory leave at the end of the eighth month of pregnancy.[7]

Even if the district court's findings were unassailable, the business necessity conclusion cannot be sustained because the district court completely failed to consider the existence of less burdensome alternatives, such as individualized decision-making, that would serve the legitimate interests of the school district as well as the mandatory leave policy. The evidence presented by both parties, and the court's own findings of fact, strongly suggest the availability of such alternatives, and *Dothard* requires that they be considered in establishing the business necessity defense.

Since the mandatory leave policy was in violation of Title VII, we have no reason to reach deLaurier's constitutional claims based on the equal protection and due process clauses of the Fourteenth Amendment. Indeed, in the present posture of the case, it is improper to discuss the constitutional issue no matter what the determination of the statutory claim. The California legislature has enacted a statute requiring that henceforth pregnancy-related disabilities be

treated the same as other temporary disabilities. Thus, only deLaurier's claim for her own individual damages remains. The complaint stated no claim for relief in damages on a constitutional theory under 42 U.S.C. § 1983. Therefore, the majority's discussion of the Fourteenth Amendment is completely unnecessary and is *dictum.* Based on my understanding of the Supreme Court's decision in *LaFleur,* I disagree with the majority's constitutional discussion. I find it unnecessary to spell out my disagreements in detail because the issue is not properly before us.

II

Remand on the denial of sick pay issue serves no useful purpose. Contrary to the suggestion of the majority, the district cannot establish a defense of business necessity based upon the extra expense of including pregnancy in its sick leave coverage. Under legislation intervening after the decision by the district court, pregnancy-related disabilities must be included in sick leave programs of California school districts. Thus, even if it costs more to provide sick leave for pregnancy, that issue is irrelevant since the passage of the legislation. The only expense which is involved is deLaurier's own sick pay. Under the sick pay scheme in existence during deLaurier's pregnancy, full-salary sick leave benefits are fully vested when earned. Sick leave is earned at the rate of 10 full salary days per year. Unused sick leave accumulates from

7. The draftsmen of the 1972 amendments of Title VII which expanded its coverage to state and local government employees like deLaurier (*see LaFleur, supra,* 414 U.S. at 639 n.8, 94 S.Ct. 791) noted that these employees already had similar remedies under 42 U.S.C. § 1981 but that Title VII coverage would be co-extensive with and supplementary to those pre-existing rights. The draftsmen made the following observations:

"The clear intention of the Constitution, embodied in the Thirteenth and Fourteenth Amendments, is to prohibit all forms of discrimination.

"Legislation to implement this aspect of the Fourteenth Amendment is long overdue, and the committee believes that an appropriate remedy has been fashioned in the bill. Inclu-

sion of state and local employees among those enjoying the protection of Title VII provides an alternative administrative remedy to the existing prohibition against discrimination perpetuated 'under color of state law' as embodied in the Civil Rights Act of 1871, 42 U.S.C. § 1983."
(H.R.Rep.No.92–238, 92d Cong., 2d Sess. (1972) *reproduced in* 1972 U.S.Code Cong. & Admin. News at 2154; *and see id.* at 2152–55.)
In *LaFleur,* the Court observed that Title VII provided for similar relief in that guidelines promulgated by the Equal Employment Opportunity Commission provided that a mandatory leave or termination policy for pregnant women presumptively violated Title VII. (414 U.S. at 639 n.8, *citing* 29 C.F.R. § 1604.10, 37 Fed. Reg. 6837.)

**692**

year to year without limit, and any unused days are paid to the employee on retirement. The additional expense of including deLaurier's sick leave pay involves such a minute expense to the district that it could not possibly satisfy the requirements of business necessity.

I would reverse with directions to declare the mandatory leave policy a violation of Title VII, and restoration to deLaurier of sick pay, together with reasonable attorney's fees both for attorney's services in the district court and on appeal.