Rory **BRAUNSTEIN et al., Plaintiffs,**

v.

**DWELLING MANAGERS, INC. and Manhattan Plaza Associates, Defendants.**

No. 78 Civ. 509.

United States District Court, S. D. New York.

Sept. 18, 1979.

As Amended Oct. 24, 1979.

Jacqueline Sands, Schwartz & Sands, New York City, for plaintiffs.

Gerald D. Roth, Stephen Sussman, Lipkowitz & Plaut, New York City, for defendants.

## OPINION AND ORDER

PIERCE, District Judge.

This is an action brought by four single parents and their respective four children [1] who claim that because of their sex they have been denied rental of two bedroom apartments in Manhattan Plaza, a federally-subsidized Mitchell-Lama housing complex.[2] Defendants are the owners and managers of Manhattan Plaza. Both parties move for summary judgment pursuant to Fed.R.Civ.P. 56.

The facts are undisputed. Defendants acknowledge that a single parent with a child of the same sex is restricted to rental of a one bedroom apartment whereas a single parent with a child of the opposite sex is permitted to rent a two bedroom unit. Defendants claim that they are enforcing a policy instituted by the New York City Department of Housing Preservation and De-

---

1. Each child is the same sex as the child's parent, i. e., father and son, or mother and daughter. The plaintiffs are Alan Braunstein and his son, Rory; Sarah Allen and her daughter, Leslie; Memrie Immerarity and her daughter, Lydia Jane; and Wendy Life and her daughter, Chena.

2. Apartments constructed under New York State's Private Housing Finance Law (N.Y.Priv. Hous.Fin.Law, Art. II (McKinney 1976) are commonly known as Mitchell-Lama units. Such projects receive substantial tax abatement and low interest mortgage loans. In addition, the United States Department of Housing and Urban Development (HUD) provides rent subsidies for tenants whose incomes satisfy the eligibility requirements. 42 U.S.C. § 1437 (1976). *See generally* 24 C.F.R. Part 880 (1978).

velopment (HPD), the municipal agency which supervises Manhattan Plaza. An affidavit from Ruth Lerner, Assistant Commissioner of HPD, agrees that this is HPD's policy based on its interpretation of regulations promulgated by the agency.[3] Defendants further maintain that the policy comports with federal guidelines.[4] Plaintiffs, on the other hand, attack the policy as violating the Fair Housing Act (42 U.S.C. § 3604),[5] and the equal protection and due process clauses of the Constitution.

*Fair Housing Act*

Section 3604, enacted in 1968, was designed primarily to remedy racial discrimination in the rental or sale of housing. *See*

*Evans v. Lynn,* 537 F.2d 571, 576–77 (2d Cir. 1975), *cert. denied,* 429 U.S. 1066, 97 S.Ct. 797, 50 L.Ed.2d 784 (1977); *Otero v. New York City Housing Authority,* 484 F.2d 1122, 1133 (2d Cir. 1973). In 1974, the section was amended to prohibit sex discrimination also.[6]

There are few cases deciding charges of sex discrimination, and detailing the parameters of the statute.[7] The facts here present the Court with a case of first impression in defining the limits of sex discrimination under § 3604. While sex discrimination is not specifically defined in the statute, cases construing similar language in Title VII (42 U.S.C. § 2000e–2)[8] have

---

**3.** The Department of Housing Preservation and the Development is the successor agency to the Housing and Development Administration (HDA). Section 10 of Article II of the "Rules and Regulations Governing City-Aided Limited Profit Housing Companies" which was promulgated by HDA and which relates to occupancy standards establishes that one bedroom apartments may be rented to (a) a married couple, (b) a married couple with one child under 12 years of age, (c) two persons of the same sex, (d) single persons fifty-five years of age and over, (e) a parent with one child, (f) single persons where categories (a) through (e) are unavailable. Two bedroom apartments may be rented to (a) a married couple with one child, (b) a married couple with two children, (c) a parent with one or two children, (d) an elderly couple where separate bedrooms are essential for each person or other married couples where separate bedrooms are mandatory, and (e) two persons other than husband and wife.

**4.** As the local housing finance agency, the Department of Housing Preservation and Development has primary responsibility for supervision and management of Manhattan Plaza. HPD must comply with HUD regulations and is subject to audit and review by the federal agency. See 24 C.F.R. § 883.302(a) (1978). Criteria established by HUD provide "The bedroom size assigned should not require persons of the opposite sex other than husband and wife to occupy the same bedroom other than infants or very young children." HUD Form 52659, Application for Tenant Eligibility and Recertification, Instructions, p. 4, III(c)(10)(b)(2).

**5.** The Fair Housing Act is also known as Title VIII of the 1968 Civil Rights Act. 42 U.S.C. § 3604 (1976) makes it unlawful:

(a) To refuse to sell or rent . . . or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, sex, or national origin.

(b) To discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race, color, religion, sex, or national origin.

(c) To make, print, or publish, or cause to be made, printed or published any notice, statement, or advertisement, with respect to the sale or rental of a dwelling that indicates any preference, limitation, or discrimination based on race, color, religion, sex, or national origin, or an intention to make any such preference, limitation, or discrimination.

(d) To represent to any person because of race, color, religion, sex, or national origin that any dwelling is not available for inspection, sale, or rental when such dwelling is in fact so available.

(e) For profit, to induce or attempt to induce any person to sell or rent any dwelling by representations regarding the entry or prospective entry into the neighborhood of a person or persons of a particular race, color, religion, sex, or national origin.

**6.** Pub.L.No.93–383, 88 Stat. 729.

**7.** *See, e. g., United States v. Reece,* 457 F.Supp. 43, 48 (D.Mont.1978); *Morehead v. Lewis,* 432 F.Supp. 674, 676 (N.D.Ill.1977). Each of these cases involved situations where members of one sex were denied housing accommodations available to members of the opposite sex.

**8.** Title VII of the 1964 Civil Rights Act, 42 U.S.C. § 2000e–2, details prohibited employment practices and declares it unlawful to:

(1) fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individu-

held that discrimination must involve "disparate treatment." *See, e. g., Sprogis v. United Airlines, Inc.,* 444 F.2d 1194, 1198 (7th Cir. 1971). "[S]ex discrimination results when the opportunities or benefits offered . . . to one gender are less valuable or more restricted than those offered to the other." *deLaurier v. San Diego Unified School District,* 588 F.2d 674, 677 (9th Cir. 1978).

The Court does not find present in this case the requisite difference in treatment which would justify a finding of discrimination. A mother and daughter who reside together receive the same treatment as a father and son; neither family is eligible for rental of a two bedroom apartment. Since the essence of sex discrimination is the difference in treatment of the individual based on gender, and males and females receive similar treatment from the defendants, there is no sex discrimination.

An analogous situation was reviewed by the Fourth Circuit in a case in which plaintiff charged sex discrimination when she lost her job because of a municipal ordinance which banned commercial massages by members of the opposite sex. The court concluded that the statute was not discriminatory since "the restrictions imposed . . . apply equally to males and females; neither can perform massages on customers who are members of the opposite sex." *Aldred v. Duling,* 538 F.2d 637, 638 (4th Cir. 1976).[9]

Plaintiffs urge the Court to rely on the Title VII discrimination test recently set forth in *City of Los Angeles Dep't of Water and Power v. Manhart,* 435 U.S. 702, 711, 98 S.Ct. 1370, 55 L.Ed.2d 657 (1978), to wit: "whether the evidence shows 'treatment of a person in a manner which but for that person's sex would be different.'" Plaintiffs contend that "but for" their sex they would be housed in larger apartments. They argue that if all other circumstances remained constant and one of the plaintiffs were of the opposite sex, *e. g.,* if a male parent with a male child were a female parent with a male child, that family would receive a larger apartment.

However, the Court finds that the variable which determines allocation of two bedroom apartments is not the sex of the individual plaintiffs, but the composition of the family unit. A female parent with a female child and a male parent with a male child receive one bedroom apartments; a female parent with a male child and a male parent with a female child receive two bedroom apartments. Distinctions based upon factors other than the individual's sex do not constitute sex-based discrimination. *See General Electric Co. v. Gilbert,* 429 U.S. 125, 134–35, 97 S.Ct. 401, 50 L.Ed.2d 343 (1976).[10]

The Court concludes that defendants' housing allocation procedure is gender-neutral, equally affecting both men and women. Accordingly, it does not constitute

---

al's race, color, religion, sex, or national origin; or

(2) limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

**9.** Courts considering the legitimacy of legislation against bisexual massages within the context of Title VII have on occasion invalidated the ordinances. *See Stratton v. Drumm,* 445 F.Supp. 1305, 1312 (D.Conn.1978) (effects of such ordinance coupled with realities of the massage business had a disproportionately detrimental impact on women); *Cianciolo v. Members of City Council,* 376 F.Supp. 719, 722–24 (E.D.Tenn.1974) (ordinance prohibiting

bisexual massages was invalid since gender was not bona fide occupational qualification). See note 10 *infra.*

In another Title VII action, male and female basketball coaches of the women's team complained that they earned less than coaches of the men's team. The court dismissed the complaint on the ground that "the disparity in treatment [was] not based on *plaintiffs' sex."* *Jackson v. Armstrong School Dist.,* 430 F.Supp. 1050, 1052 (W.D.Pa.1977); *accord, Kenneweg v. Hampton Township School Dist.,* 438 F.Supp. 575, 577 (W.D.Pa.1977).

**10.** Neither has there been any showing that the facially neutral plan in this case discriminates against a particular gender in its effect. *See General Electric Co. v. Gilbert,* 429 U.S. 125, 136–37, 97 S.Ct. 401, 50 L.Ed.2d 343 (1976).

sex discrimination in violation of the Fair Housing Act.

## Equal Protection

■ Plaintiffs also charge that defendants' housing policy classifies potential tenants and distributes apartments on the basis of gender in violation of the equal protection clause of the Constitution.[11]

At the outset, it should be noted that the policy by which defendants distribute apartments does not appear to be a gender-based classification of a type outlawed by the equal protection clause. The traditional equal protection case involves a classification that distinguishes broadly between males and females. *See, e. g., Craig v. Boren,* 429 U.S. 190, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976) (prohibition against sale of 3.2% beer to males 18–20 years of age but not to females of that age); *Reed v. Reed,* 404 U.S. 71, 92 S.Ct. 251, 30 L.Ed.2d 225 (1971) (mandatory preference of men over women as administrators of decedent's estate). In such cases, gender is often used "as an inaccurate proxy for other, more germane bases of classification." *Craig v. Boren,* 429 U.S. 190, 198, 97 S.Ct. 451, 457, 50 L.Ed. 397

(1976).[12] Yet, as has been stated previously, the underlying classification and determination of eligibility in the instant case rests on the composition of the family unit rather than the gender of the applicant. This is not a case where sex stereotyping is used as a convenient substitute for more accurate classifying criteria. *See, e. g., Orr v. Orr,* 440 U.S. 268, 278-283, 99 S.Ct. 1102, 59 L.Ed.2d 306 (1979) (With regard to alimony differentiation between males and females, sex was not a reliable proxy for financial need); *Craig v. Boren,* 429 U.S. 190, 204, 97 S.Ct. 451, 460, 50 L.Ed.2d 397 (1976) (Gender does not represent "a legitimate, accurate proxy for the regulation of drinking and driving.").

However, even if the Court were to agree that classification of the family unit and the allocation of living space were based upon gender, defendants' housing policy would withstand equal protection scrutiny nevertheless.

■ The view that gender is a suspect classification mandating a strict scrutiny review of equal protection charges has not to date commanded the approval of a ma-

11. Although the equal protection violation is urged upon the Court as a separate ground, it has of necessity been dealt with to a certain extent in the Court's analysis of the Fair Housing Act. The Court notes that in *General Electric Co. v. Gilbert,* 429 U.S. 125, 136, 97 S.Ct. 401, 50 L.Ed.2d 343 (1976), the Supreme Court held that the equal protection reasoning in *Geduldig v. Aiello,* 417 U.S. 484, 94 S.Ct. 2485, 41 L.Ed.2d 256 (1974), was applicable to an action claiming gender-based discrimination under Title VII. In discussing sex discrimination under Title VII, the Supreme Court stated:

"The concept of 'discrimination,' of course, was well known at the time of the enactment of Title VII, having been associated with the Fourteenth Amendment for nearly a century, and carrying with it a long history of judicial construction. When Congress makes it unlawful for an employer to 'discriminate . . . because of . . . sex . . .,' without further explanation of its meaning, we should not readily infer that it meant something different from what the concept of discrimination has traditionally meant." *Id.* 429 U.S. at 145, 97 S.Ct. at 412–13.

12. The Supreme Court elaborated on the "proxy" theory as follows:

" '[A]rchaic and overbroad' generalizations . . . concerning the financial position of servicewomen, *Frontiero v. Richardson,* [411 U.S. 677, 689 n. 23, 93 S.Ct. 1764, 36 L.Ed.2d 583 (1973)], and working women, *Weinberger v. Wiesenfeld,* 420 U.S. 636, 643 [95 S.Ct. 1225, 1230, 43 L.Ed.2d 514] (1975), could not justify use of a gender line in determining eligibility for certain governmental entitlements. Similarly, increasingly outdated misconceptions concerning the role of females in the home rather than in the 'marketplace and world of ideas' were rejected as loosefitting characterizations incapable of supporting state statutory schemes that were premised upon their accuracy. . . . In light of the weak congruence between gender and the characteristic or trait that gender purported to represent, it was necessary that the legislatures choose either to realign their substantive laws in a gender-neutral fashion, or to adopt procedures for identifying those instances where the sex-centered generalization actually comported with fact." *Craig v. Boren,* 429 U.S. 190, 198–99, 97 S.Ct. 451, 458, 50 L.Ed.2d 397 (1976).

jority of the Supreme Court.[13] *See Frontiero v. Richardson,* 411 U.S. 677, 93 S.Ct. 1764, 36 L.Ed.2d 583 (1973) (plurality). Instead, the Supreme Court has held that to withstand equal protection scrutiny "classifications by gender must serve important governmental objectives and must be substantially related to achievement of those objectives." *Orr v. Orr,* 440 U.S. 268, 279, 99 S.Ct. 1102, 1111, 59 L.Ed.2d 306 (1979), quoting *Califano v. Webster,* 430 U.S. 313, 316–17, 97 S.Ct. 1192, 51 L.Ed.2d 360 (1977).

Defendants contend that the objectives of their policy are twofold: to maximize the number of persons who may occupy subsidized housing and to reduce the per capita cost of such subsidy. Rent in Mitchell-Lama housing is determined as a percentage of total family income; the federal subsidy provides the difference between the rent an eligible tenant pays and the actual cost of the apartment.[14]

■ It is acknowledged that there is no Constitutional right to housing of a particular size or quality. *See Lindsey v. Normet,* 405 U.S. 56, 74, 92 S.Ct. 862, 31 L.Ed.2d 36 (1972). In this context and given the need to maximize use of available apartment space, the government's interest would best be served by allocating one bedroom apartments to all single parent families.

Plaintiffs recognize that "[i]n every equal protection attack upon a statute challenged as underinclusive, the State may satisfy the Constitution's commands either by extending benefits to the previously disfavored class or by denying benefits to both parties." *Orr v. Orr,* 440 U.S. 268, 272, 99 S.Ct. 1102, 1108, 59 L.Ed.2d 306 (1979). While a Court mandate that *all* single parent families be limited to rental of one bedroom units is not the relief these plaintiffs seek, they acknowledge the possibility of such a result and agree that such a holding would satisfy Constitutional requirements.

■ However, in allocating space in Manhattan Plaza, an exception has been carved out where the best interest of parent and child may require separate sleeping accommodations. Reasonable land use regulations are permissible if they protect the public health, safety, morals or general welfare. *Euclid v. Ambler,* 272 U.S. 365, 395, 47 S.Ct. 114, 71 L.Ed. 303 (1926). The general welfare is not to be narrowly construed; it embraces a broad range of gov-

---

**13.** The strict judicial scrutiny test requires the Court to determine whether the classification "promotes a compelling state interest." *Shapiro v. Thompson,* 394 U.S. 618, 638, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969). "In its recent sex discrimination cases, the Supreme Court has tended to state the equal protection test somewhat differently than has been common in 'rational basis' equal protection decisions of the past." *deLaurier v. San Diego Unified School District,* 588 F.2d 674, 683–84 (9th Cir. 1978). "Under 'traditional' equal protection analysis, a legislative classification must be sustained unless it is 'patently arbitrary' and bears no rational relationship to a legitimate governmental interest." *Frontiero v. Richardson,* 411 U.S. 677, 683, 93 S.Ct. 1764, 1768, 36 L.Ed.2d 583 (1973).

**14.** According to the affidavit of Richard R. Kirk, Managing Director of defendant Dwelling Managers, Inc., in December 1978, there were 35 one bedroom apartments in Manhattan Plaza that were occupied by single parents with children of the same sex. Defendants calculate that if these 35 families were to occupy two bedroom apartments, the annual increase in subsidy would be $40,740. Thus, defendants claim that "[o]ccupancy of two-bedroom apart-

ments by other than single parents obviously permits a greater number of persons to enjoy the benefits of the [federal] subsidy, and also positively tends, because of the greater number of adults, to reduce the amount of the subsidy because a certain portion of families with two adults will be comprised of multiple wage earners." (Kirk's affidavit ¶ 7).

In line with this policy of maximization of occupancy, Ruth Lerner, Assistant Commissioner of HPD, stated in her affidavit that while rental of a two bedroom apartment to a parent with a child of the opposite sex is permitted, it is not encouraged. According to Kirk's affidavit the rental staff at Manhattan Plaza was instructed to give low priority to such rentals and at the time of the affidavit there were only seven such single parent families occupying two bedroom apartments.

In addition, there were two single parent families with children of the same sex who occupied two bedroom apartments at the time of Kirk's affidavit. One was for medical reasons and the other was an administrative error. Both are exceptions to defendants' housing policy with regard to single parents with children of the same sex.

ernmental purposes. *Moore v. City of East Cleveland,* 431 U.S. 494, 498 n. 6, 97 S.Ct. 1932, 52 L.Ed.2d 531 (1977).

In specifying the public interest and general welfare they wish to protect, defendants have argued persuasively that the healthy psycho-social and sexual development of single parents and their children of the opposite sex are best served when each family member has his or her own bedroom.[15] Moreover, they claim that individual sleeping arrangements reduce the likelihood of incest and problems relating to gender misidentification. Common societal experience and conventional wisdom confirm that beyond a certain age children ought not to share the same bedroom with a person of the opposite sex.

Plaintiffs respond that empirical research on the potential psychological harm of having a single parent and child of the opposite sex share the same bedroom is limited. However, they do not refute the contention that a significant amount of social and emotional maldevelopment may be avoided where single parents and children of the opposite sex are given two bedroom apartments.

■ The Court recognizes plaintiffs' contention that the privacy need of each family member would best be served if all single parent families with one child were given two bedroom apartments. However, limited federal and municipal resources preclude this alternative. Yet, maximizing use of federal housing subsidies and protecting the physical and mental welfare of the citizenry are certainly legitimate and substantial

state interests. This Court should not "second guess" the government agency which recognized these traditional societal values and economic realities and sought to protect them. *Village of Belle Terre v. Boraas,* 416 U.S. 1, 8, 94 S.Ct. 1536, 39 L.Ed.2d 797 (1974).

■ Classifications do not violate equal protection merely because they may be imperfect, imprecise or underinclusive. *New York City Transit Authority v. Beazer,* 440 U.S. 568, 592 n. 39, 99 S.Ct. 1355, 59 L.Ed.2d 587 (1979); *Louisville Gas Co. v. Coleman,* 277 U.S. 32, 41, 48 S.Ct. 423, 72 L.Ed. 770 (1928) (Holmes, J., dissenting). Where, as here, a standard has evolved which bears a substantial relationship to an important state interest, *Caban v. Mohammed,* 441 U.S. ——, 99 S.Ct. 1760, 60 L.Ed.2d 297 (1979), and which does not use sex as a convenient administrative substitute for a more accurate classifying characteristic, *Orr v. Orr,* 440 U.S. 268, 278-283, 99 S.Ct. 1102, 59 L.Ed.2d 306 (1979), there is no equal protection violation.

*Due Process*

■ Relying on *Moore v. City of East Cleveland,* 431 U.S. 494, 97 S.Ct. 1932, 52 L.Ed.2d 531 (1977), plaintiffs further assert that defendants' housing policy has infringed on their right of privacy and has impermissibly regulated their family living arrangements without due process.

■ Housing of a particular size or quality is not a Constitutionally guaranteed right. *Lindsey v. Normet,* 405 U.S. 56, 74, 92 S.Ct. 862, 31 L.Ed.2d 36 (1972). Similar-

---

**15.** On April 5, 1979, the Court heard oral argument regarding the governmental interest served by assignment of two bedroom apartments to single parents with a child of the opposite sex. Defendants subsequently submitted affidavits and statements from two psychiatrists (Vincenzo Conigliaro, M.D. and Yale Kramer, M.D.) who presented their views on the psychological dangers which result from having a single parent and a child of the opposite sex share the same bedroom.

Dr. Kramer concluded that "affectional and sexual overstimulation is more likely to occur where the opposite sexes sleep together, and this leads to . . . impaired psychological development." In addition, where opposite

sexes sleep together there may be "traumatic overexposure to adult genitalia which may have powerful pathogenic effects on children . . . ." Finally "there is suggestive evidence that children sleeping with opposite-sexed parents reenforces a gender identification with those parents which leads to later gender-identity conflicts."

Dr. Conigliaro contended that the sharing of the same bedroom by a single parent and child of the opposite sex "could contribute to, or cause, an excessive degree of 'allosexual identifications', [where a child identifies with the parent of the opposite sex] with results bearing on character formation, Super Ego formation and sexual identity."

ly, there is no discernable Constitutional assurance that parents and children are entitled to separate bedrooms.

■ There is no doubt that freedom of personal choice in matters of family life is one of the liberties protected by due process. *Cleveland Board of Education v. La-Fleur,* 414 U.S. 632, 639, 94 S.Ct. 791, 39 L.Ed.2d 52 (1974). This Court must determine whether defendants' housing policy has trespassed into the "private realm of family life which the state cannot enter." *Moore v. City of East Cleveland,* 431 U.S. at 499, 97 S.Ct. at 1936, quoting *Prince v. Massachusetts,* 321 U.S. 158, 166, 64 S.Ct. 438, 88 L.Ed. 645 (1944).

Unlike the zoning ordinance nullified in *Moore,* the housing policy here does not preclude certain family units from living together or make certain living arrangements a crime.[16] Defendants merely afford greater living space to some families than to others.

■ Government regulation of municipally subsidized housing is permitted. *See Male v. Crossroads Associates,* 469 F.2d 616, 622 (2d Cir. 1972). The right to reside in government financed housing is not absolute; due process requires that selection of applicants be conducted according to ascertainable standards and in a reasonable manner. *Holmes v. New York City Housing Authority,* 398 F.2d 262, 265 (2d Cir. 1968).

Federal funds for housing subsidies are not unlimited. The plaintiffs have taken advantage of government subsidies to assist them in meeting their housing expenses. Having availed themselves of these government benefits, they must accept government regulations which are not discriminatory and which are rationally related to legitimate government objectives. *See Bynes v. Toll,* 512 F.2d 252, 255 (2d Cir. 1975).

Thus, defendants' policy which neither forbids a family from living together nor unduly interferes with their choice of living arrangements and which comports with all other due process requirements is not violative of plaintiffs' fourteenth amendment rights.

*Conclusion*

For the reasons stated above, the Court finds that defendants' policy of assigning two bedroom apartments to single parent families only when parent and child are of opposite sexes does not violate the Fair Housing Act or the Constitutional parameters of equal protection and due process.

Accordingly, plaintiffs' motion for summary judgment is hereby denied and defendants' motion for summary judgment is hereby granted.

SO ORDERED.

---

**16.** Justice Powell, writing for the Court in *Moore,* expressed concern that East Cleveland had "chosen to regulate the occupancy of its housing by slicing deeply into the family itself. . . . In particular, it makes a crime of a grandmother's choice to live with her grandson . . . ." *Moore v. City of East Cleveland,* 431 U.S. 494, 498–99, 97 S.Ct. 1932, 1935, 52 L.Ed.2d 531 (1977).