Thomas P. DAUBNER, Maria Isabel So-lares, Marcelle Crepeau and George Bittner, Sr., Each individually and on behalf of all other persons similarly situated and affected by the policies, practices and usages complained of, Plaintiffs,

v.

Patricia Roberts HARRIS, Secretary of United States Department of Housing & Urban Development et al., Defendants.

Elizabeth GITLIN, Plaintiff,

v.

DWELLING MANAGERS, INC., and Manhattan Plaza, Inc., Defendants.

Nos. 77 Civ. 6247, 78 Civ. 0547.

United States District Court,
S. D. New York.

May 1, 1981.

Brennan & Daubner by William T. Brennan, Laurelton, N. Y., for plaintiffs Thomas P. Daubner, Maria Isabel Solares, Marcelle Crepeau and George Bittner, Sr.

Gerald Schwartz, New York City, for plaintiff Elizabeth Gitlin.

Lipkowitz & Plaut by Gerald D. Roth, Stephen Sussman, New York City, for defendants Dwelling Managers, Inc., and Manhattan Plaza, Inc., et al.

John S. Martin, Jr., U. S. Atty. for the Southern Dist. of New York by Jonathan A. Lindsey, Asst. U. S. Atty., New York City, for defendants Harris, et al.

Allen G. Schwartz, Corp. Counsel by Charles Olstein, Asst. Corp. Counsel, New York City, for municipal defendants.

## OPINION

GRIESA, District Judge.

These two actions challenge the criteria for selection of tenants in the Manhattan Plaza apartment complex on West 42nd Street, New York City, a project in which the great majority of the tenants receive federal rent subsidies under Section 8 of the United States Housing Act of 1937, as amended, 42 U.S.C. § 1437f. Plaintiffs allege violation of that statute, and also violations of their constitutional rights.

The *Gitlin* action is an individual claim by Elizabeth Gitlin against the owners of Manhattan Plaza.

There are four plaintiffs in the *Daubner* action: Thomas P. Daubner, Maria Solares Vega, Marcelle Anne Crepeau and George E. Bittner. The defendants in the *Daubner* action are Manhattan Plaza, Inc. and certain other parties associated with the Manhattan Plaza project; the City of New York and various city officials; and officials of the Federal Government.

*Daubner* was brought as a class action. The class described in the complaint consists of residents of the area in which the Manhattan Plaza project is located, who would be eligible for subsidies under federal law and who were allegedly excluded because of the criteria used by defendants in selecting tenants. The class is said to number more than 10,000 persons.

The *Daubner* plaintiffs failed to move for class certification, and defendants made an application to dismiss the class action allegations. This application was not decided before trial.

The question of whether *Daubner* should proceed as a class action is somewhat academic. Although the prayer for relief in the complaint contains a request for damages on behalf of the class, this is little more than a token pleading. The issues which have been litigated in earnest relate to the requests for injunctive relief, and can be completely disposed of by dealing with the claims of the individual plaintiffs. *See Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 263–64, 97 S.Ct. 555, 562, 50 L.Ed.2d 450 (1977). Defendants in *Daubner* are entitled, however, to a ruling on their application to dismiss the class action allegations. Since there was no timely motion by plaintiffs for class certification, defendants' application is granted. *See East Texas Motor*

*Freight v. Rodriguez*, 431 U.S. 395, 97 S.Ct. 1891, 52 L.Ed.2d 453 (1977).

Both the *Gitlin* and *Daubner* actions were tried to the court without a jury. This opinion constitutes the court's findings of fact and conclusions of law.

For the reasons hereafter set forth, the court finds that plaintiffs' claims are without merit. The complaints are dismissed.

## I.

Manhattan Plaza occupies the entire city block bounded by West 42nd and 43rd Streets and Ninth and Tenth Avenues. There are 1,688 apartments in the development. Thirty-seven percent (626) of the units are studio apartments; 47 percent (798) have one bedroom; and 16 percent (264) have two bedrooms.

When the project was originally conceived, it was to receive benefits under New York State's Mitchell-Lama Law, Article 2 of the Private Housing Finance Law—*i. e.*, it was to receive certain real property tax exemptions and mortgage financing benefits. The original proposal did not include federal rent subsidies.

The developers of Manhattan Plaza and the New York City Housing and Development Administration ("HDA")[1] obtained Mitchell-Lama approval in 1973 from the City Planning Commission and the Board of Estimate. Construction began in early 1974.

For a variety of reasons it became clear that the Manhattan Plaza apartments would not be able to be rented at rates necessary to cover operating costs and debt service. This led to efforts to obtain federal rent subsidies under Section 8 of the Housing Act.

Among the steps which must be carried out in order to obtain Section 8 rent subsidies is the submission of an "Affirmative Fair Housing Marketing Plan" to the Department of Housing and Urban Development ("HUD"). Manhattan Plaza and HDA submitted such a plan to HUD dated December 8, 1975. Since this plan was later superseded, the details of this plan need not be described, except to note that it included the following statement about the expected racial composition of the project:

"As a result of our special outreach efforts, we expect to achieve an integrated tenancy approximately 70% white, 20% black, and 10% Spanish speaking."

HUD notified HDA of its approval of this marketing plan by letter dated October 7, 1976.

Meanwhile, a federal court action had been brought challenging the project. *The Broadway Association, Inc. v. Carla Hills, et al.* 76 Civ. 1521 (S.D.N.Y.). The action apparently resulted from concern that federally subsidized housing for low-income families would have a detrimental effect upon the area. On May 25, 1976 the case was settled by stipulation. In view of the fact that the 1973 submission of the project to the City Planning Commission and the Board of Estimate did not include the concept of federal rent subsidies, it was agreed that the proposal would be resubmitted. The City Planning Commission and the Board of Estimate would be asked to decide whether to approve Mitchell-Lama benefits for Manhattan Plaza now that the plan included the intention to seek federal subsidies.

Manhattan Plaza and HDA developed a new Affirmative Fair Housing Marketing Plan. They retained Settlement Housing Fund, Inc., an organization with considerable expertise in the field of low income housing, to prepare this new plan.

The Fund's report was issued in July 1976. The report contained an extensive analysis of information about residential and employment patterns in the area. According to the testimony of the Study Director, several alternative plans were considered, and were evaluated on the basis of how they would foster the following goals—achieving racial integration, obtaining responsible tenants, and producing a desirable impact on the mid-Manhattan west side area and New York City as a

---

1. The HDA is now known as the Department of Housing Preservation and Development.

whole. The study recommended that there be priority given for all the apartments in Manhattan Plaza to persons in the performing arts. The basis for this recommendation was the view that performing artists would have a particular tie to, and a particular interest in preserving and upgrading the Times Square area and the theater district of New York City. It was also thought that performing artists constituted a racially integrated group, from which a responsible tenantry could be obtained.

On November 3, 1976 there was a public hearing before Community Planning Board No. 4, whose area of responsibility is roughly the Chelsea and Clinton neighborhoods on Manhattan's midtown west side. Following the hearing, the board passed a resolution proposing that Manhattan Plaza should be predominantly occupied by performing artists, but recommending that a substantial percentage of the apartments be reserved for community residents, including the elderly, who are not affiliated with the performing arts.

Subsequently the City Planning Commission considered two alternate proposals. The first was to market 100% of the apartments to performing artists. The second was to market 85% of the apartments to performing artists and 15% to residents of Community Planning District No. 4 who were living in sub-standard housing. On January 3 and 4, 1977 the City Planning Commission approved the first alternative and voted to reject the second.

By resolutions of February 3, 1977 and March 14, 1977, the Board of Estimate approved the concept of federal rent subsidies for Manhattan Plaza on the basis of a marketing plan which would give priority to performing artists for at least 70% of the apartments; priority to elderly persons in Community Planning District No. 4 for up to 15% of the apartments; and priority to persons residing in sub-standard housing within Community Planning District No. 4 for up to 15% of the apartments.

The Affirmative Fair Housing Marketing Plan was submitted to HUD. This plan included the priorities approved by the Board of Estimate, and projected that the racial composition of the tenant households would be 1180 Whites (non-minority), 235 Blacks, 235 Spanish American, 10 American Indian, and 30 Oriental. These figures work out to the following percentages:

| | |
|---|---|
| White (non-minority) | 69.8% |
| Black | 13.9 |
| Spanish American | 13.9 |
| American Indian | .6 |
| Oriental | 1.8 |

In conjunction with the submission of the Affirmative Fair Housing Marketing Plan, the owners of Manhattan Plaza requested that HUD grant an increase in the income ceilings for persons eligible for Section 8 rent subsidies at the project.

The context of this request was that, under Section 8, rent subsidies can be paid only for "lower-income families," defined in the statute to be those families whose incomes do not exceed 80 per centum of the median income for the area, as determined by the Secretary. 42 U.S.C. § 1437f(f)(1). The basic income limits applicable to Manhattan Plaza in 1977 were as follows:

| | |
|---|---|
| One person | $ 9,050 |
| Family of two | $11,600 |
| Family of three | $13,050 |
| Family of four | $14,500 |

Pursuant to authority in 42 U.S.C. § 1437f(f)(1), the Secretary of HUD is empowered to establish income ceilings higher than 80 per centum of the median for the area under certain circumstances. In connection with the Manhattan Plaza project, HUD raised the applicable income limits by 35% for up to 30%, or 506, of the apartments. This meant that, for these apartments, the income limits were:

| | |
|---|---|
| One person | $13,700 |
| Family of two | $15,700 |
| Family of three | $17,600 |
| Family of four | $19,600 |

HUD also approved the Affirmative Fair Housing Marketing Plan, including the 70% priority to performing artists, 15% priority to elderly persons, and 15% to persons residing in sub-standard housing. HUD specified that there would be a reexamination, after 25% of the units had been assigned, in

order to determine if satisfactory racial integration had been achieved.

On May 19, 1977 HUD entered into an Annual Contributions Contract with HDA, providing that up to approximately $11 million per year in rental subsidies would be paid for Manhattan Plaza. On May 25, 1977 HDA entered into a contract with Manhattan Plaza under which HDA agreed to pay over the rental subsidy amounts to the owners of Manhattan Plaza.

The processing of applications commenced in early 1977. As would be expected, there were far more applications than apartments. The complex was fully occupied by January 1978.

In 1978, HUD conducted a review of the racial composition of Manhattan Plaza, which showed that 71% of the units were occupied by Whites (non-minority); 15% by Blacks; 12% by Hispanics; and 2% by Orientals.

The evidence at trial showed that the racial composition of the Chelsea-Clinton Area is approximately 72% non-minority Whites, and 28% minorities.

## II.

The following are the facts regarding the individual plaintiffs.

*Thomas P. Daubner*

Daubner is White and an attorney. Since 1964 he has resided in an apartment building at 300 West 49th Street, in the Clinton area. This is a rent controlled building. He pays approximately $125 per month for his 3½ room apartment.

According to Daubner's testimony, he devotes a substantial amount of his time to legal work for which he receives little or no compensation. During the time relevant to this action he earned only about $6,000 a year from his law practice. Family income from other sources, including Social Security payments to his wife and daughter, brought the total family income up to about $10,000 a year.

Daubner learned about the opportunity to apply for Manhattan Plaza in early February 1977, and immediately filed an application for a subsidized apartment, which stated that he resided in sub-standard housing. His application was considered by Manhattan Plaza in relation to the sub-standard housing category.

In June 1977 a representative of Manhattan Plaza inspected Daubner's apartment at 300 West 49th Street. Later in the same month Daubner was given a personal interview. On June 24, 1977 Daubner signed a lease for Apartment M–16 in Manhattan Plaza and made a deposit of $495, covering one month's rent of $205, a security deposit of another month's rent, and the cost of investigation. Daubner was given a tentative move-in date of July 12. In early July 1977 a representative of Manhattan Plaza asked Daubner for a certified copy of his 1976 income tax return. Daubner was assured that the apartment would be held for him until this document was provided. The certified copy was sent to Manhattan Plaza in mid-August.

In early September Daubner received a letter from Manhattan Plaza stating that the project would not enter into a lease with him because his current housing was not found to be sub-standard. The testimony shows that Daubner's application had been preliminarily approved and was being processed, when a complaint was received alleging that improper favoritism was being shown to Daubner in allowing him to obtain a rent subsidy for Manhattan Plaza. This complaint caused Manhattan Plaza and the City to make an inquiry, which resulted in a finding that Daubner's apartment at 300 West 49th Street was not sub-standard. The building at 300 West 49th Street has eight floors with 107 apartments. There is a 24-hour receptionist in the lobby. The building is structurally sound, although in need of various repairs (undoubtedly due to the low rentals of the type of which Daubner is a beneficiary). It is superior in quality to much of the housing in the Chelsea-Clinton area, which consists of older buildings (so-called "old law" tenements) with inadequate light and heating, bathtubs in kitchens, and toilets in halls. Many of these buildings are structurally deteriorated

to the extent that any rehabilitation would require complete gutting.

*Maria Solares Vega*

Mrs. Vega is listed in the complaint under the name Maria Solares. She is Hispanic, and applied for a two-bedroom apartment at Manhattan Plaza in February 1977 under the sub-standard housing category. She had two children and had an income of $4700 a year from Public Assistance.

There were only 39 two-bedroom apartments available for the sub-standard housing category of applicants, against many times that number of applications. Mrs. Vega was rejected because of the lack of apartments.

*Marcelle Crepeau*

Mrs. Crepeau is White. She was 79 years old and applied for an apartment as an elderly person in February 1977. She was apparently turned down because, at the time of her application, there was a rule against dogs. She had a dog. Later, Manhattan Plaza changed its rule to admit dogs. However, Mrs. Crepeau was not notified of this change.

In any event, aside from the dog problem, she was not eligible for an apartment. The priority given to elderly persons related solely to those in the Chelsea-Clinton area. Although Mrs. Crepeau had lived in the Chelsea-Clinton area for many years, she had moved to the Bronx in 1966 where she resided at the time of her application to Manhattan Plaza.

*George Bittner*

Mr. Bittner is White and is disabled, having been the victim of three strokes. His wife, Mary Bittner, testified at trial. She and her husband resided in Clinton Towers, a nearby subsidized housing project. They applied to Manhattan Plaza because they believed that there were better facilities for the handicapped than at Clinton Towers. Their application was rejected. Mr. and Mrs. Bittner did not fall within any of the priority categories for Manhattan Plaza. There was no priority for handicapped persons. Moreover, they already resided in subsidized housing.

*Elizabeth Gitlin*

Miss Gitlin is White. She applied for Manhattan Plaza in December 1976, stating that she was a performing artist.

Miss Gitlin was a member of a group known as the Chamber Dance Group at the end of 1973 and the beginning of 1974, at which time she sustained an injury. She attempted to rejoin the group in 1976 but was unable to do so because of her injury. She has done no professional dancing since that time.

Her application for Manhattan Plaza was rejected on the ground that she did not fit within the project's definition of performing artist:

"*A Performing Artist*—One who can establish that he/she has actively pursued for at least a period of three years a career in the performing arts and/or evidence that one-half or more of their total income over a consecutive three-year period is derived from the performing arts and/or evidence that they are an active member of a performing arts association."

### III.

The *Daubner* plaintiffs assert the following basic claims:

*First*, that the federal rent subsidy priority for performing artists is not authorized by Section 8 of the United States Housing Act;

*Second*, that the performing artist priority amounts to an unlawful classification violating Equal Protection rights;

*Third*, that the performing artist priority is unconstitutional because it was a subterfuge for accomplishing racial discrimination;

*Fourth*, that there were inadequate and irregular administrative mechanisms for handling rental applications, resulting in a denial of procedural due process.

Plaintiff Gitlin's claims are basically limited to the second and fourth of the above.

## IV.

With regard to the first of the arguments listed above, the *Daubner* plaintiffs assert that the effect of giving the 70% priority to persons in the performing arts is to create a criterion not authorized by Section 8 of the Housing Act, and to discriminate against poor persons in favor of a higher income group. The *Daubner* plaintiffs assert that the purpose of Section 8 is to aid persons who are too economically deprived to afford adequate housing; that the purpose of the statute is *not* to aid a particular group such as performing artists, particularly when such a group does not constitute the most economically deprived class of persons in the area involved in the subsidized project.

A discussion of this problem must begin with a somewhat lengthy description of the relevant portions of Section 8. Subsection (a) contains a statement of purpose:

"(a) For the purpose of aiding lower-income families in obtaining a decent place to live and of promoting economically mixed housing, assistance payments may be made with respect to existing, newly constructed, and substantially rehabilitated housing in accordance with the provisions of this section." 42 U.S.C. § 1437f(a).

The statute goes on to provide in subsection (b):

"(2) ... the Secretary is authorized to make assistance payments pursuant to contracts with owners or prospective owners who agree to construct or substantially rehabilitate housing in which some or all of the units shall be available for occupancy by lower-income families in accordance with the provisions of this section. The Secretary may also enter into annual contributions contracts with public housing agencies pursuant to which such agencies may enter into contracts to make assistance payments to such owners or prospective owners." 42 U.S.C. § 1437f(b)(2).

The last sentence of subsection (b) is the precise provision under which the Manhattan Plaza rent subsidies are paid. As already noted, there was an annual contribu-tions contract between HUD and HDA, followed by a contract between HDA and the owners of Manhattan Plaza.

Continuing with the summary of Section 8, subsections (c)(1)–(2) deal with the establishment of maximum monthly rentals which may be used as a basis for determining the amounts of subsidy payments. 42 U.S.C. §§ 1437f(c)(1) and (2).

Subsection (c)(3) provides for the calculation of subsidies:

"(3) The amount of the monthly assistance payment with respect to any dwelling unit, in the case of a large very low-income family, a very large lower income family, or a family with exceptional medical or other expenses, as determined by the Secretary, shall be the difference between 15 per centum of one-twelfth of the annual income of the family occupying the dwelling unit and the maximum monthly rent which the contract provides that the owner is to receive for the unit. In the case of other families, the Secretary shall establish the amount of the assistance payment as the difference between not less than 15 per centum nor more than 25 per centum of the family's income and the maximum rent, taking into consideration the income of the family, the number of minor children in the household, and the extent of medical or other unusual expenses incurred by the family. Reviews of family income shall be made no less frequently than annually (except that such reviews may be made at intervals no longer than two years in the case of families who are elderly families)." 42 U.S.C. § 1437f(c)(3).

Subsection (c)(4) is the portion of the statute which specifies that no assistance payments may be made except for "a family determined to be a lower-income family." As shown by the definitions below, "lower-income" families include the sub-classification "very low-income families." 42 U.S.C. § 1437f(c)(4).

In the definitions contained in Section 3, which apply to Section 8, it is provided that at least 20% of the dwelling units in any

project placed under annual contributions contracts in any fiscal year shall be occupied by very low-income families. 42 U.S.C. § 1437a(1). The regulations issued by HUD in effect raise this requirement for very low-income families to 30%. 24 C.F.R. § 880.603(c) (1980) (formerly 24 C.F.R. § 883.213(b) (1977)). The Annual Contributions Contract between HUD and HDA for Manhattan Plaza contains the 30% requirement.

Subsection (f) of Section 8 defines "lower-income families" and "very low-income families" as follows:

"(f) As used in this section—

(1) the term 'lower income families' means those families whose incomes do not exceed 80 per centum of the median income for the area, as determined by the Secretary with adjustments for smaller and larger families, except that the Secretary may establish income ceilings higher or lower than 80 per centum of the median for the area on the basis of his findings that such variations are necessary because of prevailing levels of construction costs, unusually high or low family incomes, or other factors;

(2) the term 'very low-income families' means those families whose incomes do not exceed 50 per centum of the median income for the area, as determined by the Secretary with adjustments for smaller and larger families; ..." 42 U.S.C. § 1437f(f).

Aside from the general income limits, and the requirement for a certain percentage of very low-income families, there is no provision in Section 8 specifying what criteria may or may not be used in the selection of tenants. However, Section 6, 42 U.S.C. § 1437d(c), provides that every annual contributions contract between HUD and a local housing agency shall provide that:

"(4) the public housing agency shall comply with such procedures and requirements as the Secretary may prescribe to assure that sound management practices will be followed in the operation of the project, including requirements pertaining to—

(A) the establishment of tenant selection criteria designed to assure that, within a reasonable period of time, the project will include families with a broad range of incomes and will avoid concentrations of low-income and deprived families with serious social problems, but this shall not permit maintenance of vacancies to await higher income tenants where lower income tenants are available; ..."

■ Section 8 provides, with respect to certain mechanics for the payment of rent subsidies, that selection of tenants shall be the function of the owner of the project. 42 U.S.C. §§ 1437f(d)(1) and (e)(2). There is, however, no specific provision in Section 8 regarding tenant selection in the case of newly constructed housing administered under an annual contributions contract between HUD and a local housing agency. However, it is certainly implicit from the statute as a whole that tenant selection in such a case is to be the function of the owner of the project, consistent with general standards set by HUD and the local agency.

There is no allegation in the present case that the income limits for subsidy recipients have not been observed, or that the provisions regarding calculation of the amounts of subsidies have not been complied with. The attack is upon the method of selecting subsidy recipients—specifically upon the priority given to persons in the performing arts with respect to 70% of the apartments. It should be noted that there is no objection to the priority given to elderly persons for 15% of the apartments or to the priority given to persons residing in sub-standard housing for another 15%.

The argument against the performing arts priority is not without substance. The establishment by the owners of Manhattan Plaza of the performing arts priority is in effect a selection of a very narrow and specialized class of persons within the broad category of lower income persons. This priority has the effect of excluding many persons of lower income who presumably would have had a chance of obtaining a rent subsidy at Manhattan Plaza in the absence of a performing arts priority.

It can be argued with some force that the purpose of Congress in the Housing Act is limited to assisting persons whose economic deprivation prevents them from obtaining "decent, safe, and sanitary dwellings" (see 42 U.S.C. § 1437). The specific descriptions of subsidy recipients in Section 8 are only in terms of income categories—"lower income families" and "very low-income families." The argument is that Congress does not, through the Housing Act, undertake to aid the arts, or to assist in community development, except by providing decent housing to lower income persons.

While the issue is hardly free from doubt, an examination of the statute as a whole and pertinent legislative history indicates that the balance tips in favor of upholding Manhattan Plaza's performing arts priority.

Section 8 was part of a 1974 amendment to the United States Housing Act of 1937. The new legislation was entitled the Housing and Community Development Act of 1974. The original Housing Act had provided for certain forms of federal assistance to local housing programs other than the type of rent subsidies involved in Section 8. The 1974 amendment added the Section 8 rent subsidies and made certain changes with respect to the other provisions.

By the time of the 1974 statute, Congress had become concerned with certain problems connected with federal housing aid, including the tendency under certain circumstances to have public housing projects become concentrations of impoverished persons. A Senate Committee noted:

"While it is expected that public housing agencies will continue to give particular attention and priority to very low income families, the Committee expects that in the long run we would have more housing developments which are not occupied solely by the very poor, but by a cross section of lower income households, representing a variety of household types...." S.Rep.No. 693, 93d Cong., 2d Sess. 40, reprinted in [1974] U.S.Code Cong. & Ad.News, 4273, 4311.

The same report stated further:

"The Committee also has in mind the benefits that result from having projects occupied by families of varying income levels. It recognizes that in communities where housing is scarce and expensive, families in a fairly broad spectrum of income may be unable to obtain decent housing through the unaided operations of the private sector, and economic diversity and integration in housing occupancy can be accomplished only through allowing families within such a spectrum to occupy Federally assisted housing." S.Rep.No. 693, at 45; [1974] U.S.Code Cong. & Ad.News, at 4315.

█ In the statute as originally enacted in 1937, the beneficiaries of the law were defined to be "families of low income," which were in turn defined to be "families who are in the lowest income group and who cannot afford to pay enough" to obtain fit housing in the private market. Housing Act, Sections 2(1) and (2), 50 Stat. 888. The 1974 amendment omits reference to "families who are in the lowest income group." 42 U.S.C. § 1437a(2). Section 8 deals in terms of two categories of income groups— "lower income families" and "very low-income families." The former is defined as families whose incomes do not exceed 80% of the median income for the area, and the latter is defined as families whose incomes do not exceed 50% of the median income for the area. 42 U.S.C. § 1437f(f)(1) and (2). Moreover, Section 8 allows HUD to raise the definition of "lower income" beyond the 80% figure—something which was done for Manhattan Plaza as already described. 42 U.S.C. § 1437f(f)(1). Except for the stipulation that at least 20% (increased by HUD regulation to 30%) of the units in any project must go to very low-income families, 42 U.S.C. § 1437a(1), Section 8 subsidies may be paid to any family whose income falls within the somewhat liberal definition of "lower income." The conclusion which must be drawn is that Congress intended to benefit a considerably broader spectrum of persons than that which was benefited under the original Housing Act.

█ The definition of the income limits leaves open the question of how the subsidy

recipients for a particular housing project are to be selected from the potentially large numbers whose incomes fall within the statutory limits. As indicated in the foregoing analysis of Section 8, it appears clear that the case-by-case processing of applications and selection of tenants is to be carried out by the owners of the subsidized project; and there are no stated limitations on the discretion of the project owners, so long as the income limits are observed and the subsidies are calculated according to the statutory formulas. In other words, the project owners may make their determinations regarding good character, financial responsibility, and other relevant factors. Moreover, there is no express limitation in the statute preventing project owners from establishing broad criteria, such as the granting of priority to persons in particular occupations.

With respect to the local housing authorities Congress has imposed a specific mandate (quoted earlier) that every annual contributions contract must provide that the public housing agency will take steps to establish tenant selection criteria designed to assure that "the project will include families with a broad range of incomes and will avoid concentrations of low-income and deprived families with serious social problems." 42 U.S.C. § 1437d(c)(4).

It is clear that the performing artist priority had, as one of its purposes, to provide subsidies for persons in a broad income range and to "avoid concentrations of low-income and deprived families with serious social problems." The report of the Settlement Housing Fund which, with some modifications, became the basis for the Affirmative Fair Housing Marketing Plan submitted to HUD, stated (Pl. Ex. 27, pp. 12–13):

"Association with the performing arts industry is the criterion for living in MP [Manhattan Plaza] which promises the strongest foundation for developing a sense of community in and sense of responsibility to MP and the surrounding neighborhood. The performing arts criterion will bring to MP a multi-racial and mixed income profession with a practice of working together in close personal relationships. This tradition should facilitate both renting prospects and the process of a racially and economically diverse tenantry living together in inter-racial harmony in a new, high-rise setting. Moreover, MP's professional identity should attract market rent-paying and middle-income performers. What's more, MP's professional identification should provide a stronger assurance of the tenants' responsibility for the upkeep of the development and the neighborhood than such arbitrary devices as minimum incomes and minimum rents. The tenants' residential interest in a well-maintained development and neighborhood should be reinforced by their occupational interest in improving the Times Square area. A strong managerial role for the performing arts' organizations and tenants should strengthen these prospects.

"The low, moderate, and middle income performers' desires for decent housing, convenient to employment opportunities and costing no more than 25% of their incomes, should create a large core of responsible tenants committed to long-term residence in and maintenance of the development and its surroundings."

In connection with HUD's approval of the increase in income limits for Manhattan Plaza, a HUD report, specifically approved by Secretary Harris, stated (Def. Ex. I):

"The proposed marketing plan has distinct advantages in terms of neighborhood revitalization, economic integration and long term cost to the Department. It would attract tenants who have a professional interest in improving the neighborhood, which borders on the theatrical district. It would demonstrate the flexibility of Section 8 by reaching a broad income range and promoting the kind of economic integration the Department has always favored but rarely achieved. . . ."

■ Related to the purpose of ensuring tenants of a broad income range was the purpose, noted in the above-quoted reports, of aiding the cultural and economic rehabil-

itation of certain sections of New York City. There is no specific authority in the statute for using Section 8 housing subsidies to achieve such a purpose. By the same token, there is no specific prohibition against it. It goes without saying that the commercial and cultural objectives in the performing artist priority are valuable objectives to be pursued by New York City and Manhattan Plaza. It is the conclusion of the court that they are consistent with the general intention of Congress, and that the overall purpose and application of the performing artist priority is valid.

## V.

■ Plaintiffs argue that the performing arts priority violates the Constitution. The harm or unconstitutional deprivation alleged to have resulted from the priority is that various low-income individuals were deprived of access to a publicly-funded housing project. Because poverty does not describe a suspect classification, *San Antonio Independent School District v. Rodriguez*, 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973); *Dandridge v. Williams*, 397 U.S. 471, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970); *Male v. Crossroads Assoc.*, 469 F.2d 616 (2d Cir. 1972), and because housing of a particular quality is not accorded the status of a fundamental right, *Lindsey v. Normet*, 405 U.S. 56, 74, 92 S.Ct. 862, 874, 31 L.Ed.2d 36 (1972), Manhattan Plaza's rental program must only be shown to constitute a rational means for achieving a legitimate governmental end. *San Antonio Independent School District v. Rodriguez, supra.*

■ The goals which New York City sought to achieve in connection with Manhattan Plaza included the rehabilitation of the City's midtown west side and the pres-

ervation and strengthening of the City's unique place in the cultural life of the nation.[2] The court finds such objectives to be not only legitimate, but laudable and important governmental ends.

■ The remaining question is whether the Manhattan Plaza marketing plan constitutes a rational means of reaching the outlined goals. For equal protection analysis, the requirement that the methods and classifications employed be rational does not mean that they must be flawless or engender absolute equality. *Dandridge v. Williams*, 397 U.S. 471, 485, 90 S.Ct. 1153, 1161, 25 L.Ed.2d 491 (1970).

■ The performing artist classification comports with this constitutional requirement. The performing arts industry provides a naturally integrated and economically heterogeneous market. Moreover, the importance of the Times Square neighborhood to the theater industry suggests that performing artists would feel a heightened responsibility to the area, which would enhance the likelihood of effective area rehabilitation. The court finds that the performing artist priority at Manhattan Plaza constitutes a rational approach to achieving the City's goals.[3]

## VI.

■ Plaintiffs' third basic claim is that defendants adopted the performing artist priority in order to achieve racial segregation at Manhattan Plaza. This theory is asserted against the city defendants and Manhattan Plaza under the Equal Protection Clause of the Fourteenth Amendment. As to the federal defendants, reliance is placed upon the Due Process Clause of the Fifth Amendment, which embodies the con-

---

**2.** Section 11a of the Mitchell-Lama Law specifies that housing assistance is to be used as part of a "total attack" directed to the "revitalization and improvement of the quality of urban life" in municipalities of the state.

**3.** An additional argument of plaintiffs is that the residency requirement imposed on the 30% non-performing arts households violates the Constitution. Clearly defined and bona fide residency requirements which are uniformly

applied are not constitutionally invalid. *Memorial Hospital v. Maricopa County*, 415 U.S. 250, 255, 94 S.Ct. 1076, 1080, 39 L.Ed.2d 306 (1974); *Dunn v. Blumstein*, 405 U.S. 330, 342 n.13, 92 S.Ct. 995, 1003 n.13, 31 L.Ed.2d 274 (1972). Plaintiffs presented no evidence that a *duration* of residence was required, and the court makes no findings as to whether such a requirement existed and the legality thereof.

cept of equal protection. *Davis v. Passman*, 442 U.S. 228, 234, 99 S.Ct. 2264, 2271, 60 L.Ed.2d 846 (1979); *Buckley v. Valeo*, 424 U.S. 1, 93, 96 S.Ct. 612, 670, 46 L.Ed.2d 659 (1976).

In their complaint, plaintiffs also invoke various civil rights statutes, 42 U.S.C. §§ 1981, 1982, 1983, 1985 and 2000d, as well as the Fair Housing Act of 1968, 42 U.S.C. §§ 3604 and 3608. At no time have plaintiffs articulated specific claims or standards associated with any of the statutory provisions. Throughout the pretrial papers and the evidence adduced at trial, argument is based solely on the claim of a violation of "equal protection."

It appears that plaintiffs perceive any statutory claim to derive from their constitutional argument. In such a case, the court need only analyze the constitutional claim. *Citizens Committee for Faraday Wood v. Lindsay*, 507 F.2d 1065, 1068 n.5 (2d Cir. 1974), *cert. denied*, 421 U.S. 948, 95 S.Ct. 1679, 44 L.Ed.2d 102 (1975). Moreover, insofar as it could be argued that additional rights or remedies may be conferred by the referenced statutes, those claims have been abandoned by plaintiffs. *Herrmann v. Moore*, 576 F.2d 453, 455 (2d Cir.), *cert. denied*, 439 U.S. 1003, 99 S.Ct. 613, 58 L.Ed.2d 679 (1978). *See also* C. Wright, *Law of Federal Courts* § 68 at 322 (3d edition 1976).

Our inquiry, therefore, will focus on equal protection as it is guaranteed by the Fifth and Fourteenth Amendments to the Constitution.

█ In order to succeed on a constitutional claim of racial discrimination, it is necessary to demonstrate the presence of discriminatory intent in addition to any impact on racial or ethnic minorities. *Washington v. Davis*, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976). The Supreme Court has applied this rule to public housing. *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977).

█ Courts have allowed such an intent to be shown through either of two routes—

by direct evidence of discriminatory motive or by circumstantial evidence, such as legislative or administrative history or the nature and quality of a disproportionate impact. *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, *supra* at 265–268, 97 S.Ct. at 563–565; *Resident Advisory Board v. Rizzo*, 564 F.2d 126 (3d Cir. 1977). Plaintiffs have failed to show discrimination at Manhattan Plaza in either manner.

The circumstantial evidence question will be dealt with first. The court finds that there is no disproportionate impact on minorities, nor is there other circumstantial evidence of an unlawful motive. Population figures presented at trial established that the Chelsea-Clinton neighborhood is comprised of approximately 72% non-minority and 28% minority persons. The occupancy statistics at Manhattan Plaza, reflecting the goals set out in the affirmative marketing plan, show a ratio of 71% non-minority to 29% minority residents. Moreover, to further rebut an inference of a disproportionate impact, the same proportions obtain among persons on the waiting list and in the rejected category. While some persons may have been prevented from living at Manhattan Plaza by the performing artist priority, any impact on minorities was not racially focused and does not trigger an inference of an unconstitutional discriminatory motive.

Plaintiffs have also failed to provide any direct evidence of an unlawful motive. The racial occupancy goals set out in the affirmative marketing plan submitted on behalf of the project indicate that racial composition was not ignored by those responsible for the planning of Manhattan Plaza. Insofar as race was a factor taken into account, however, that consideration was legitimate. The occupancy goals reflected a desire to establish an integrated tenancy, while not "tipping" the neighborhood's racial balance by introducing a disproportionate number of minority residents into the area. The Court of Appeals for this circuit has recognized the legitimacy of such a purpose. *Otero v. New York City Housing Authority*,

484 F.2d 1122 (2d Cir. 1973) (noting that a housing authority has an affirmative duty to plan for long-range integration, even if this operates to the immediate disadvantage of some minority individuals). *See also Karlen v. Harris*, 590 F.2d 39 (2d Cir. 1978).

Plaintiffs have not demonstrated the existence of invidious racial animus as a factor underlying the development of Manhattan Plaza's rental program. They have failed to make out a case of unconstitutional discrimination.[4]

### VII.

Plaintiffs' final major contention is that the rent-up program at Manhattan Plaza violated their constitutional right to due process. This argument has two components: (1) The program, as generally administered, lacked sufficient safeguards to provide due process; and (2) the handling of plaintiffs' individual applications violated the law.

As to the general complaint, it is established that, while admissions to publicly-aided housing projects are subject to due process requirements, courts should interfere with the administration of a project only if there are no ascertainable standards to guide the owner's discretion, and a resulting arbitrary exercise of power. *See Holmes v. New York City Housing Authority*, 398 F.2d 262, 265 (2d Cir. 1968); *Colon v. Tompkins Square Neighbors, Inc.*, 294 F.Supp. 134, 139 (S.D.N.Y.1968).

The rental program at Manhattan Plaza was closely supervised by HDA and by HUD. It used ascertainable standards for admission, and provided sufficient notice to parties as to the fact of and basis for any rejection. As generally administered, it did not violate the guarantees of due process. *See Braunstein v. Dwelling Mana-*

gers, Inc., 476 F.Supp. 1323 (S.D.N.Y.1979), (involving one aspect of the allocation of apartments at Manhattan Plaza).

On the question of the handling of the applications of the individual plaintiffs, the court concludes that the findings of fact set forth earlier in this opinion demonstrate that there are no valid claims of violation of constitutional rights.

### Conclusion

For the foregoing reasons defendants in both of the captioned actions are entitled to judgment dismissing the complaints.

Settle judgments.

---

4. Were this court to consider plaintiffs' claims under the Fair Housing Act, despite abandonment of that statute as a separate theory for relief, the claims would still have to be dismissed. While it is easier to establish a *prima facie* violation of the Fair Housing Act (Title VIII) than to establish violation of the Equal Protection Clause, a showing of discriminatory impact is required for such a *prima facie* show-

ing. Moreover, to prevail in a Title VIII action, a plaintiff must go beyond establishing disproportionate impact and rebut a defendant's proffered justification for his actions. *Metropolitan Housing Development Corp., et al. v. Village of Arlington Heights*, 558 F.2d 1283 (7th Cir. 1977) (*on remand*). Plaintiffs here have met neither of these burdens.